74 A.3d 876

ADVANCE HOUSING, INC. AND ADVANCE HOUSING 2000, PLAIN-
TIFFS–RESPONDENTS, v. TOWNSHIP OF TEANECK, BOR-
OUGH OF BERGENFIELD, BOROUGH OF LITTLE FERRY,
BOROUGH OF RAMSEY, BOROUGH OF RIDGEFIELD PARK,
BOROUGH OF LODI, BOROUGH OF FAIRVIEW, BOROUGH OF
LEONIA, CITY OF HACKENSACK, DEFENDANTS–APPEL-
LANTS.

Argued January 15, 2013—Decided September 25, 2013.

*William F. Rupp* argued the cause for appellant Township of Teaneck (*Ferrara, Turitz, Harraka & Goldberg,* attorneys).

*Paul M. Elias* argued the cause for appellant Borough of Fairview (*Bittiger Triolo,* attorneys; *Jason L. Bittiger,* of counsel and on the brief).

*William R. Betesh* argued the cause for appellants Village of Ridgefield Park and Borough of Bergenfield (*Boggia & Boggia,* attorneys).

*Harry D. Norton, Jr.,* argued the cause for appellant Borough of Ramsey (*Norton, Sheehy, Higgins & Rosa,* attorneys; *Mr. Norton* and *Neil A. Tortora,* on the brief).

*Joel M. Ellis* argued the cause for respondents (*Kates Nussman Rapone Ellis & Farhi,* attorneys; *Mr. Ellis, Michael B. Kates,* and *Bruce L. Nussman,* on the brief).

*Thomas S. Dolan* argued the cause for *amici curiae* the Judge David L. Bazelon Center for Mental Health Law, Disability Rights New Jersey, New Jersey Department of the Public Advocate, Alliance for the Betterment of Citizens with Disabilities, American Association of People with Disabilities, Mental Health America, Mental Health Association in New Jersey, National Alliance on Mental Illness, National Alliance on Mental Illness of New Jersey, and Supportive Housing Association of New Jersey.

*Donald J. Lenner* submitted a letter in lieu of brief on behalf of appellant City of Hackensack.

*Joseph G. Monaghan* submitted a letter in lieu of brief on behalf of appellant Borough of Little Ferry.

*Marcel R. Wurms* submitted a letter in lieu of brief on behalf of appellant Borough of Lodi.

Justice ALBIN delivered the opinion of the Court.

Many of our citizens suffering from mental disabilities, who are presently institutionalized, can live independent and productive lives in supportive housing in our communities. The challenge has been to find sufficient housing with accompanying services for the mentally disabled. In 2005, the Governor's Task Force on Mental Health reported that many persons institutionalized with mental illness could not be discharged from New Jersey hospitals because of the dearth of affordable housing that offered comprehensive support services. Governor's Task Force on Mental Health, Final Report, *New Jersey's Long and Winding Road to Treatment, Wellness and Recovery* 6 (Mar. 31, 2005) [hereinafter *2005 Task Force Report* ], *available at* http://www.state.nj.us/humanservices/dmhs/recovery/Governor_final_report.pdf. In response to the *2005*

*Task Force Report*, Governor Richard Codey issued Executive Order No. 78 stating that "[t]he financing of the State of New Jersey's mental health system should be changed to promote state-of-the-art treatment alternatives," such as "permanent supportive housing." 38 *N.J.R.* 1109(b) (Jan. 13, 2006).

Plaintiffs Advance Housing and its subsidiary, Advance Housing 2000,[1] both not-for-profit corporations, provide supportive housing and services for mentally disabled individuals in Bergen County. To fulfill its mission, Advance Housing purchased properties with the assistance of funding from the United States Department of Housing and Urban Development (HUD), the Division of Mental Health Services in the New Jersey Department of Health and Senior Services (DMHS), county-run programs, and private donations. Advance Housing's clients with mental disabilities live independently in residences where they receive various mental-health, occupational, and other support services.

Defendants, nine Bergen County municipalities, denied Advance Housing property tax exemptions for charitable purposes under *N.J.S.A.* 54:4–3.6. The Tax Court denied Advance Housing's appeal. The court found an insufficient nexus between the housing provided and the services offered by Advance Housing to justify a charitable property tax exemption.

The Appellate Division reversed and remanded for a judgment granting Advance Housing the charitable property tax exemption. *Advance Housing, Inc. v. Twp. of Teaneck*, 422 *N.J.Super.* 317, 335, 28 *A.*3d 841 (App.Div.2011). It determined that Advance Housing had fully integrated its housing and support services and satisfied the test set forth in *Presbyterian Homes of the Synod of N.J. v. Division of Tax Appeals*, 55 *N.J.* 275, 283, 261 *A.*2d 143 (1970). *Ibid.* More specifically, the Appellate Division held that Advance Housing used the property for the charitable purpose of

---

[1] For the most part, we will refer to Advance Housing and Advance Housing 2000 collectively as "Advance Housing."

deinstitutionalizing the mentally disabled, thus relieving the government of having to provide for their housing and care.

We affirm. Advance Housing's residences are actually used for charitable purposes consonant with *N.J.S.A.* 54:4–3.6, entitling the property to tax-exempt status. Advance Housing's provision of housing with integrated supportive services to mentally disabled citizens, who otherwise would be dependent on government relief, is in furtherance of this State's express policy. The property— purchased, in large measure, at public expense—serves a vital need that would otherwise be borne by the State at a much greater cost. Accordingly, we hold that Advance Housing has met its burden of showing that the properties are entitled to charitable tax-exempt status under *N.J.S.A.* 54:4–3.6.

## I.

### A.

As explained in its certificate of incorporation and bylaws, Advance Housing is a charitable, non-profit corporation formed for the purpose of providing affordable housing and "normalized community living arrangements for psychiatrically disabled individuals" from low- and moderate-income families. To support this mission, Advance Housing applied for funding from HUD to purchase five condominiums under Section 811 of the National Affordable Housing Act. HUD advised Advance Housing to establish a separate non-profit corporation, to account for HUD-sponsored funding. As a result, Advance Housing 2000 was established to purchase and lease properties and "[t]o develop residential services to enhance and secure the mental and moral improvement of persons with chronic mental disabilities." Other housing units had been purchased with monies from DMHS.

Plaintiff Advance Housing owns fourteen residential properties in nine municipalities in Bergen County: the Township of Teaneck; the Boroughs of Bergenfield, Little Ferry, Ramsey, Ridgefield Park, Lodi, Fairview, and Leonia; and the City of Hacken-

sack. Advance Housing applied for property tax exemptions with these municipalities for the years 2002, 2003, and 2004.[2] The municipalities rejected the applications, taking the position that Advance Housing's properties were not used for a charitable purpose or some other purpose recognized by *N.J.S.A.* 54:4–3.6. The Bergen County Board of Taxation affirmed the denial of tax exemption for the properties.

Advance Housing appealed to the Tax Court, and the parties filed cross motions for summary judgment. We summarize here the core facts contained in the summary-judgment record. The material facts are essentially not in dispute. Instead, the parties contest the legal conclusions to be drawn from those facts.

### B.

Advance Housing and Advance Housing 2000 are 501(c)(3) corporations [3] and therefore exempt from federal income tax. For operational purposes, Advance Housing receives approximately seventy-five percent of its funding from DMHS, fifteen percent from HUD, and the balance from clients' rents, Medicaid reimbursements, and private donations. The vast majority of funding is allocated to services rather than housing. Advance Housing is not a profit-making entity and its funding is used exclusively to advance its charitable mission.

Advance Housing offers "a supportive housing program to help people with psychiatric disabilities transition to independent living in the community." To that end, it provides not only housing, but also mental-health, occupational-placement, and life-management support services to low- and moderate-income individuals suffering from mental illness. Without this assistance, these individuals

---

[2] Advance Housing has also filed appeals for the years 2005 through 2009. The parties agree that the outcome of the appeals for the earlier years will have binding effect on these later appeals.

[3] *I.R.C.* § 501(c)(3) exempts from federal taxation "[c]orporations ... organized and operated exclusively for ... charitable ... purposes ...."

would be unable to live independently. The "supportive housing model" combines "affordable, lease-based housing" with "comprehensive [and] flexible services." Thirty-three of Advance Housing's clients live and receive services in fourteen residences it owns in the defendant municipalities. The remaining "sixty-three or sixty-four" clients receive services from Advance Housing in other residences not under its control. Advance Housing's residents have experienced periods of institutionalization, psychiatric hospitalization, or homelessness or risk of homelessness due to a psychiatric disability.

Its residents come from places such as homeless shelters, transitional housing facilities, and hospitals that provide services to mentally ill individuals. Both DMHS and HUD place restrictions on the use of their funding. For example, some HUD programs require that a resident living in an Advance Housing unit meet a statutory definition of homelessness, whereas DMHS mandates that a resident come from a state hospital or a group home. According to Advance Housing's President and Chief Executive Officer, Mary Rossettini, many of its clients "would be actually homeless" if not housed in one of its residences.

Advance Housing receives fair market value for its rental units as determined by HUD. However, residents living in Advance Housing's units pay only thirty percent of their adjusted income as rent. The balance comes from various rental-assistance programs run by HUD, such as Section 8,[4] Section 811,[5] and the Supportive Housing Program.[6]

---

[4] Section 8, 42 *U.S.C.A.* § 1437f, is a housing-voucher program run by HUD in which a "housing subsidy is paid to the landlord directly by the [public housing agency] on behalf of the participating family" and "[t]he family then pays the difference between the actual rent charged by the landlord and the amount subsidized by the program." U.S. Dep't of Hous. & Urban Dev., *Housing Choice Vouchers Fact Sheet*, http://portal.hud.gov/hudportal/HUD?src=/topics/housing_choice_voucher_program_section_8 (last visited Aug. 26, 2013).

[5] Section 811, 42 *U.S.C.A.* § 8013, is a similar housing-voucher program run by HUD that provides funding specifically to "subsidize rental housing with the availability of supportive services for very low-income adults with disabilities."

Advance Housing's residents sign a lease, which provides that failure to pay rent or abide by other terms of the lease may result in eviction. Indeed, HUD mandates that Advance Housing reserve the right to terminate a lease based on non-payment of rent for units funded by its Section 811 program. Advance Housing, however, has never evicted or attempted to evict a tenant who failed to pay rent. Advance Housing may also terminate a client's lease if the client no longer needs supportive and counseling services or if the services are inadequate to meet the client's needs. HUD and DMHS both prohibit Advance Housing from requiring a client to accept supportive services as a condition of residency.[7] Under the supportive housing model, forcing services

---

U.S. Dep't of Hous. & Urban Dev., *Section 811 Supportive Housing for Persons with Disabilities*, http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/mfh/progdesc/disab811 (last visited Aug. 26, 2013).

[6] The Supportive Housing Program, authorized by Title IV of the McKinney–Vento Homeless Assistance Act of 1987, awards grants through an annual national competition to promote "the development of supportive housing and supportive services to assist homeless persons in the transition from homelessness and to enable them to live as independently as possible." U.S. Dep't of Hous. & Urban Dev., *Supportive Housing Program*, http://portal.hud.gov/hudportal/HUD?src=/program_offices/comm_planning/homeless/programs/shp (last visited Aug. 26, 2013); *see also* 42 U.S.C.A. § 11301.

[7] *See* 42 *U.S.C.A.* § 8013(i)(2)(c) ("A supportive service plan ... shall permit each resident to take responsibility for choosing and acquiring their own services, to receive any supportive services made available directly or indirectly by the owner of such housing, or to not receive any supportive services."); U.S. Dep't of Hous. & Urban Dev., *Section 11 Supportive Housing for Persons with Disabilities*, www.hud.gov/offices/hsg/mfh/progdesc/disab811.cfm (last visited Aug. 26, 2013) (stating that "residents cannot be required to accept any supportive service as a condition of occupancy"); *N.J.A.C.* 10:37A–1.2 (stating that in "supportive housing residence ... [n]o lease or residential agreement shall contain the provision of mandatory mental health program participation as a requirement for the consumer resident to maintain housing"); N.J. Dep't of Human Servs., *Home to Recovery—CEPP Plan: Plan to Facilitate the Timely Discharges of CEPP Patients in New Jersey's State Psychiatric Hospitals*, 29 (2008), *available at* http://www.state.nj.us/humanservices/dmhs/olmstead/CEPP_Plan_1_23_08_FINAL.pdf (stating that in supportive housing model "rental hous-

on an unwilling participant is considered counterproductive to the goal of developing independence and trust. *2005 Task Force Report, supra,* at 107–08.

Advance Housing's CEO has certified that the supportive housing program offered by Advance Housing seeks to "facilitate the transition from dependent living to independent living for individuals with psychiatric disabilities by providing them with essential services." Every client admitted into Advance Housing's program enters into a "Consumer Service Agreement" and "Comprehensive Service Plan" that explain the services provided by the program. The nature, degree, and duration of the services depend on the needs of the individual client. Some residents with "very significant needs ... are seen seven days a week, two to three times a day." Another resident, however, might require services "only once a week for maybe an hour or two."

Among the services offered are counseling; vocational guidance and support; crisis intervention; coordination of and transportation to AA meetings, medical appointments, and recreational activities; and assistance with daily living activities, such as cooking, cleaning, food shopping, taking medication, budgeting and paying bills, and securing statutory benefits and entitlements. If, for example, a resident suffers "psychiatric decompensation," rendering him or her unable to handle financial matters, Advance Housing may even temporarily become the resident's "representative payee" and take control of the resident's finances for the purpose of paying rent and other vital living expenses. Advance Housing has staff not only working seven days a week, but also on-call after-hours to respond to emergencies.

Advance Housing has forty-nine full- and part-time employees, including caseworkers. It employs two part-time psychiatrists, two nurses, and various mental-health professionals. Advance Housing's clients receive services in their residences. According

---

ing is provided upfront and is not contingent upon the completion of treatment, rehabilitation or other services").

to Kevin Martone, the former president and chief executive officer of Advance Housing, the services provided allow individuals "with severe and persistent mental illness to maintain a level of independence in the community" and to contribute to the workforce.

Martone also certified that the cost of funding a psychiatrically disabled individual in a residence in Advance Housing is far less than the cost of institutionalizing that individual in a State facility. In 2005, the cost of maintaining a patient in a State psychiatric hospital was $146,000 per year, in a group home $60,000 per year, and in an Advance Housing residence $20,000 per year.

Task forces commissioned at the county and state levels have endorsed the supportive-housing model to meet the needs of psychiatrically disabled individuals. In 1992, a Residential Task Force presented to the Bergen County Mental Health Board a report that "identified a service gap between suitability for hospital-level care and appropriateness for residential care." The 1992 Residential Task Force, *An Analysis of Residential Services* 9 (Sept. 21, 1992). The report revealed that a Bergen County psychiatric hospital was unable to timely discharge patients suffering from mental illness because of "[a] shortage of community resources." *Ibid.* The 1992 Residential Task Force promoted "supportive permanent housing" as a means of addressing the needs of the mentally ill "who are unable to sustain independent community living," *id.* at 9, and as a way "to reduce overutilization of the emergency services system and inpatient recidivism," *id.* at 11.

The Governor's *2005 Task Force Report, supra,* called for the State "to dramatically shift its vision to a 'Housing First' philosophy for people with mental illness," coupling housing with "a new model of community-based services that [are] flexible, comprehensive and accessible." *Id.* at 106. The *2005 Task Force Report* disclosed that almost one-half of state hospital patients—numbering approximately 1,000 patients—"are clinically ready for discharge but housing, treatment and support services are not avail-

able for these patients." *Id.* at 6. In short, "[t]he need for affordable, supportive housing exceeds the supply." *Id.* at 109.

Martone averred that the organization "is the largest provider of permanent supportive housing in Bergen County" and that "[n]othing else is available in [the] County that provides the same level of services within the context of permanent supportive housing." Because federal, state, and local governments do not provide services comparable to Advance Housing, Martone warns that without funding for permanent supportive housing for the mentally ill, these individuals are at greater "risk of homelessness, increased emergency room medical care and greater exposure to the criminal justice system."

## II.

Based on this record, the Tax Court entered summary judgment in favor of the nine defendant Bergen County municipalities, finding that the fourteen properties owned by Advance Housing were not entitled to property tax exemption pursuant to *N.J.S.A.* 54:4–3.6.

Advance Housing argued that its properties should have been granted property tax exemption under three separate provisions of *N.J.S.A.* 54:4–3.6. Advance Housing, as a non-profit corporation, claimed exemption from property taxes because its buildings are (1) "actually and exclusively used for . . . adults and children with intellectual disabilities"; [8] (2) "actually used . . . for the moral and mental improvement of men, women and children"; and (3) "actually used . . . for . . . charitable purposes." *N.J.S.A.* 54:4–3.6. The

---

[8] The Legislature amended *N.J.S.A.* 54:4–3.6 in 2010 by replacing "feeble minded or idiotic persons or children" with "[a]dults and children with intellectual disabilities." *L.* 2010, *c.* 50, § 81. The Tax Court decided the summary judgment motion based on the pre-amendment language. The amendment discarded anachronistic language for contemporary terminology that embraces our current understanding and sensibilities concerning individuals afflicted with disabilities.

Tax Court found none of these bases for granting a property tax exemption applicable to Advance Housing.

The court determined that Advance Housing was a non-profit organization formed exclusively for a charitable purpose, but that its residences were not actually and exclusively used for that charitable purpose and therefore did not meet the test for a property tax exemption under *Presbyterian Homes, supra,* 55 *N.J.* at 283, 261 *A.*2d 143.[9]

The court observed that property used for subsidized housing alone would not justify tax-exempt status under *N.J.S.A.* 54:4–3.6, but that an "integrated program of the provision of both housing and supportive counseling services" would pass the test. The court, however, concluded that the "housing component" in Advance Housing's program was "not integrated with the counseling and support services." The court reached this conclusion by reasoning that only a minority of Advance Housing's clients who receive counseling and support services also live in its housing and that the clients are not required to participate in the counseling and supportive program "but may do so at their own volition." Another factor considered by the court—although not dispositive—was that Advance Housing's caseworkers might see the clients in their residences for only "a couple of hours a week." According to the court, Advance Housing was running "essentially a subsidized housing program for clients who happen to be eligible for [its] supportive and counseling services." In denying Advance Housing relief, the court expressed that "some institutional aspect to the housing program" is necessary for a tax exemption under *N.J.S.A.* 54:4–3.6. On the other hand, the Tax Court determined that Advance Housing's "headquarters facilities and any facilities" to which clients traveled to receive supportive services would be tax exempt.

---

[9] The Tax Court failed to note that, in 2001, the Legislature removed the word "exclusively" from this part of the statute, which now requires only that the property be "actually" used for a charitable purpose. *L.* 2001, *c.* 18.

## III.

The Appellate Division reversed, holding that Advance Housing was entitled to property tax exemptions under the *Presbyterian Homes* test because it is organized for a charitable purpose, operates on a non-profit basis, and uses its property "actually and exclusively" for its charitable activities. *Advance Hous., supra,* 422 *N.J.Super.* at 335, 28 *A.*3d 841 (citing *Presbyterian Homes, supra,* 55 *N.J.* at 283, 261 *A.*2d 143). In an opinion by Judge Waugh, the appellate panel rejected the Tax Court's notion that Advance Housing did not qualify for a property tax exemption because its residences lacked an "institutional aspect." *Id.* at 330, 28 *A.*3d 841. As the panel noted, the goal of Advance Housing, and supportive housing in general, is to deinstitutionalize individuals with psychiatric disabilities and promote independent living in the community. *Id.* at 330–31, 28 *A.*3d 841.

The panel expressed its disagreement with the Tax Court on several points. First, the panel did not believe that Advance Housing's supply of supportive services to clients in residences other than its own suggested that it did "not provide an integrated housing and services program" to clients in the residences it did own. *Id.* at 331, 28 *A.*3d 841. Second, it did not believe that the absence of a contractual obligation on the part of Advance Housing's residents to participate in counseling services undermined the fact that all its residents actually receive counseling services. *Ibid.* For purposes of *N.J.S.A.* 54:4–3.6, the charitable exemption is conditioned, "in part, on how the building is 'actually' used." *Ibid.*

In reaching the conclusion that the integrated program of housing and services provided by Advance Housing "is of the type the Legislature sought to benefit through the general 'charitable' property tax exemption contained in *N.J.S.A.* 54:4–3.6," the panel referred favorably to two Tax Court cases, *Community Access Unlimited, Inc. v. City of Elizabeth,* 21 *N.J.Tax* 604 (Tax 2003), and *Salt & Light Co. v. Mount Holly Twp.,* 15 *N.J.Tax* 274 (Tax 1995), *aff'd o.b.,* 16 *N.J.Tax* 40 (App.Div.1996), *certif. denied,* 148

*N.J.* 458, 690 *A.*2d 606 (1997). In both cases, the Tax Court determined that properties were used for charitable purposes, justifying tax exemptions under *N.J.S.A.* 54:4–3.6, when housing and services were provided to individuals who had mental disabilities, *Community Access, supra,* 21 *N.J.Tax* at 617–18, or who were homeless, *Salt & Light, supra,* 15 *N.J.Tax* at 277. *Id.* at 331–33, 28 *A.*3d 841.

Teaneck, Bergenfield, Little Ferry, Ramsey, Ridgefield Park, Lodi, Fairview, and Hackensack (collectively municipalities) petitioned for certification.[10] We granted certification. *Advance Hous., Inc. v. Twp. of Teaneck,* 209 *N.J.* 100, 35 *A.*3d 683 (2012).

## IV.

### A.

Defendant municipalities urge reversal on various different grounds, all agreeing that the Appellate Division erred in granting a charitable property tax exemption to Advance Housing under *N.J.S.A.* 54:4–3.6.[11] The municipalities advance the following arguments, some individually and some collectively.

The municipalities contend that there is no vital linkage between Advance Housing's counseling and housing components, for the counseling can be provided in housing it does not own and the counseling is not a mandatory requirement for remaining in housing. The municipalities point out that two-thirds of Advance Housing's clients do not reside in Advance Housing's residences, that the clients' lease agreements do not require the clients to submit to counseling, and that the supportive/counseling services

---

[10] Leonia appeared as a defendant in the appeal to the Tax Court. Leonia, however, did not file either a brief with the Appellate Division or petition for certification.

[11] Teaneck submitted a brief that Little Ferry, Lodi, and Hackensack joined; Ridgefield Park and Bergenfield jointly submitted a brief; and Ramsey and Fairview each submitted their own briefs.

can be provided at a central facility. They consider Advance Housing a glorified landlord providing government-subsidized housing and emphasize that some clients receive minimal supportive/counseling services during the week.

The municipalities stress that because Advance Housing's clients must volunteer for supportive services, the housing and services are independent of each other and that without an integral connection between the two, a charitable tax exemption is not warranted by *N.J.S.A.* 54:4–3.6. Moreover, they submit that Advance Housing has not shown that subsidized housing is integral or necessary to the success of its counseling services, noting that Advance Housing does not suggest that its non-residents who are counseled are any less successful than its residents.

The municipalities question Advance Housing's assertion that its clients would become homeless or a burden on the government without the supportive housing model given the numerous organizations in Bergen County and the State that accept Section 8 tenants. They also challenge the Appellate Division's reliance on *Community Access, supra,* 21 *N.J.Tax* 604 and *Salt & Light, supra,* 15 *N.J.Tax* 274. They state that, unlike Advance Housing, the non-profit entity in *Community Access* used its own resources to administer its properties if tenants were unable to pay rent, the non-profit entity in *Salt & Light* received less than market rental value for its properties, and that neither maintained the power to evict a tenant for failure to pay rent. Finally, the municipalities insist that the Appellate Division failed to balance the loss of revenue resulting from exempting Advance Housing's property from taxation against Advance Housing's claim of relieving the government of a burden that it otherwise would have to bear.

B.

Advance Housing counters that, based on the record, its housing and supportive counseling elements are fully integrated and its properties are actually and exclusively used for a charitable activi-

ty. It therefore asserts that the Appellate Division properly granted it a property tax exemption under *N.J.S.A.* 54:4–3.6.

Advance Housing makes the following arguments: (1) no other provider offers a comparable supportive housing program in Bergen County; (2) it serves a critical need and relieves the government of a burden it would otherwise bear, given that almost half of psychiatrically disabled patients in New Jersey State Hospitals cannot be discharged because housing, treatment, and support services are unavailable; (3) without its supportive housing program its clients might be rendered homeless or the fragile state of their mental health might deteriorate; (4) without its program these psychiatrically disabled individuals would be set adrift, further straining a social-service system of emergency shelters and community hospitals, or be added to a burgeoning prison population; (5) Advance Housing promotes the deinstitutionalization of psychiatrically disabled patients, which not only relieves the state and local governments of a significant cost, but also furthers an important public policy; (6) the housing and supportive counseling are inextricably linked because the counseling is on site and fosters independent living in a residence that might otherwise not be available; (7) the focus should be on how Advance Housing uses the property for which it seeks a charitable property tax exemption rather than on how it services other mentally ill clients in other locales; (8) the success of supportive housing requires that psychiatrically disabled individuals freely accept—without compulsion—counseling and other services; and (9) private landlords who provide housing to the psychiatrically disabled receiving supportive services from Advance Housing will not gain a tax exemption windfall as a result of the Appellate Division decision because those landlords are not charitable organizations and would not satisfy the *Presbyterian Homes* test.

V.

A.

The material facts are essentially not in dispute. The legal issue before us is the interpretation of *N.J.S.A.* 54:4–3.6—the

property-tax-exemption statute—and its application to the facts of this case. We recognize the expertise of the Tax Court in this "specialized and complex area." *Metromedia, Inc. v. Dir., Div. of Taxation*, 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984). Although the Tax Court's factual findings "are entitled to deference because of that court's expertise in the field," we need not defer to its interpretation of a statute or legal principles. *Waksal v. Dir., Div. of Taxation*, 215 *N.J.* 224, 231–32, 71 *A.*3d 878 (2013) (internal quotation marks and citations omitted). We review de novo the Tax Court's grant of summary judgment in this case. *See id.* at 231–32, 71 *A.*3d 878 (citing *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 539–40, 666 *A.*2d 146 (1995)).

We begin with some fundamental principles. Statutory exemptions from taxation should be "strictly construed against those invoking the exemption." *Hunterdon Med. Cent. v. Twp. of Readington*, 195 *N.J.* 549, 569, 951 *A.*2d 931 (2008) (quoting *Paper Mill Playhouse v. Millburn Twp.*, 95 *N.J.* 503, 506–07, 472 *A.*2d 517 (1984)). This rule reflects the well-established policy that "the public tax burden is to be borne fairly and equitably." *Int'l Sch. Servs., Inc. v. W. Windsor Twp.*, 207 *N.J.* 3, 15, 21 *A.*3d 1166 (2011). For that reason, an entity seeking a tax exemption has the burden of showing its entitlement to the exemption. *Ibid.* Nonetheless, this " 'rule of strict construction must never be allowed to defeat the evident legislative design.' " *N.J. Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth*, 147 *N.J.* 171, 177–78, 685 *A.*2d 1309 (1996) (quoting *Boys' Club of Clifton, Inc. v. Twp. of Jefferson*, 72 *N.J.* 389, 398, 371 *A.*2d 22 (1977)), *cert. denied*, 520 *U.S.* 1241, 117 *S.Ct.* 1845, 137 *L.Ed.*2d 1048 (1997).

### B.

Real property owned by a non-profit, charitable organization, which is used exclusively for charitable purposes—"as defined by law"—is specifically exempted from taxation under the New Jersey Constitution. *N.J. Const.* art. VIII, § 1, ¶ 2. The "law"

governing property tax exemptions is contained in *N.J.S.A.* 54:4–3.6. Several parts of the property-tax-exemption statute are relevant in this appeal:

[A]ll buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, provided that if any portion of a building used for that purpose is ... otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt; [A]ll buildings actually used in the work of associations and corporations organized exclusively for ... charitable purposes, provided that if any portion of a building used for that purpose is ... otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion shall be exempt from taxation ...

[P]rovided, in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit ....

[*N.J.S.A.* 54:4–3.6].[12]

In this case, neither the Tax Court nor the Appellate Division distinguished between the "mental and moral improvement" and "charitable purposes" provisions of the statute. Evidently, both courts used the terms interchangeably in considering Advance Housing generally as a non-profit, charitable organization. For our purposes here, we need not distinguish between an association for "the moral and mental improvement of men, women and children" and a charitable organization. The paramount issue is whether the residences in which Advance Housing's clients live and receive supportive counseling are used for charitable purposes and are therefore entitled to an exemption under *N.J.S.A.* 54:4–3.6.

■ To establish its right to a property tax exemption, Advance Housing must satisfy the statutory three-part test that flows from *N.J.S.A.* 54:4–3.6. Advance Housing must show that: (1) it is organized exclusively for a charitable purpose; (2) its property is actually used for such a charitable purpose; and (3) its use and

---

[12] Advance Housing initially sought an exemption under what is now termed the "intellectual disability" portion of the statute. *N.J.S.A.* 54:4–3.6. Advance Housing does not invoke this part of the statute in this appeal.

operation of the property is not for profit. *See N.J.S.A.* 54:4–3.6; *see also Paper Mill Playhouse, supra,* 95 *N.J.* at 506, 472 *A.*2d 517 (applying analogous three-pronged test to "moral and mental improvement" exemption of *N.J.S.A.* 54:4–3.6); *Presbyterian Homes, supra,* 55 *N.J.* at 283, 261 *A.*2d 143 (referencing statutory requirements).

We applied this test in *Presbyterian Homes, supra,* a case involving a non-profit entity that claimed that a retirement community—Meadow Lakes—served a "charitable purpose" within the meaning of *N.J.S.A.* 54:4–3.6. 55 *N.J.* at 284, 261 *A.*2d 143. On this, our first occasion to define "charitable purpose," we noted that "whether property is devoted to charitable purposes depends upon the facts or circumstances of each case." *Id.* at 285, 261 *A.*2d 143. In engaging in a fact-specific analysis, we kept in mind that one justification for granting a charitable tax exemption is that if the charitable work were not done by a private party, it would have to be done at public expense. *Ibid.* We ultimately concluded in *Presbyterian Homes, supra,* that the retirement community was not serving a charitable purpose and therefore was not exempt from paying property taxes under *N.J.S.A.* 54:4–3.6. *Id.* at 288, 261 *A.*2d 143. We looked to the following evidence to reach that conclusion.

Meadow Lakes, a retirement village, consisted of 221 units, mostly garden apartments, set within a milieu of "recreational and service facilities" that included "bowling greens," "gift and beauty shops," "lounges," "game rooms," "a health center," and a dining room where meals "prepared by an independent contractor ... are served by waitresses." *Id.* at 279–80, 261 *A.*2d 143. Each resident paid an admission fee, also known as a founder's fee, which was usually retained by Meadow Lakes. *Id.* at 280, 261 *A.*2d 143. The fee ranged from $12,000 to $43,000 depending on the size of the unit, and residents paid monthly charges ranging from $205 to $365. *Id.* at 280–81, 261 *A.*2d 143.

We observed that neither the articles of incorporation nor the residence agreements required Meadow Lakes "to care for per-

sons who become either financially unable to meet their monthly charges or unmanageable because of illness"; that the termination of an agreement might result in residents, who had already spent their assets, returning to their families or transferring to an institution, thus becoming a financial burden on the State; and that the "fees and rentals" demanded from the elderly residents "negate[d] a 'charitable purpose.'" *Id.* at 287, 261 *A.*2d 143. In our view, a "quid pro quo permeate[d] the entire operation" because the residents, in effect, were purchasing something of value. *Ibid.*

In *Presbyterian Homes, supra,* we reasoned that whether care of the aged "will constitute a charitable purpose depends upon the manner in which the particular property is used to accomplish that end." *Id.* at 288, 261 *A.*2d 143. So, although property used for the purpose of caring "for the needy aged" has been held to be tax exempt, property used for the purpose of caring for "financially independent elderly persons who alone can qualify for admission to" such places as Meadow Lakes will not. *Ibid.* Accordingly, we held that the Meadow Lakes "property is not tax exempt since it is not 'actually' used for 'charitable' purposes." *Ibid.*

In *Paper Mill Playhouse, supra,* we granted a property tax exemption under the "moral and mental improvement" provision of *N.J.S.A.* 54:4–3.6 to a non-profit corporation operating a theater that promoted the arts by hosting the production of "concerts, dramas, ballet and musical performances." 95 *N.J.* at 506–07, 472 *A.*2d 517. In applying the statutory three-part test, we found that the Paper Mill Playhouse's property was "actually and exclusively used" for "the moral and mental improvement of men, women, and children." *Id.* at 506–07, 524, 472 *A.*2d 517. In ruling in favor of Paper Mill, we made several salient points. Paper Mill was a Section 501(c)(3) exempt corporation that dedicated all income to operating the theater, *id.* at 511, 472 *A.*2d 517, and "[n]one of [its] surplus can be traced into someone's pocket," *id.* at 522, 472 *A.*2d 517; it received "tremendous financial support and extraordinary recognition" from the State, *id.* at 515, 472 *A.*2d 517; and it was

not a commercial enterprise because "no commercial enterprise, whose essential purpose is to make money, [would] follow Paper Mill's policies," *id.* at 524, 472 *A.*2d 517.

*Presbyterian Homes* and *Paper Mill Playhouse* set reasonable standards, not an insurmountable hurdle, for a non-profit company obtaining a property tax exemption when property is actually used for a charitable purpose. Although the issue before this Court is one of first impression, it is not unfamiliar to the Tax Court. Therefore, we turn to several Tax Court decisions for guidance.

## C.

The case most similar to ours is *Community Access, supra,* 21 *N.J.Tax* 604. There, pursuant to *N.J.S.A.* 54:4–3.6, the Tax Court granted a charitable property tax exemption to a non-profit, 501(c)(3) corporation, Community Access, that provided housing and services to individuals with mental disabilities. *Id.* at 618–19. Community Access's stated goal—similar to Advance Housing's— is to provide people with mental disabilities "the opportunity to live independently and to lead normal and productive lives as citizens integrated into the general community." *Id.* at 611. Like Advance Housing, Community Access does not charge its residents more than thirty percent of their income as rent, and rent never exceeds fair market value, *id.* at 615; it does not evict residents because of inability to pay, *id.* at 608; and it places its members "in housing and programs, which address their specific needs as well as level of independence," *id.* at 609. Similar to Advance Housing's caseworkers, Community Access's counselors "provide advice and assistance in obtaining employment, medical care and childcare, education and job training," and "meet regularly" with residents, *id.* at 616, all of whom participate in the service programs, *id.* at 609. The Tax Court determined that "the housing itself is secondary to [Community Access's] main purpose, which is to give individuals incapable of functioning on their own an opportunity to live as close to a normal life as possible." *Id.* at 617. Finally, the Tax Court emphasized that "rehabilitating the

mentally disabled is an important and legitimate governmental concern," and that without the services of Community Access the care of its residents would be borne at public expense. *Id.* at 617–18.

Also comparable to the present case is *Salt & Light, supra,* 15 *N.J.Tax* 274. In that case, the Tax Court granted Salt and Light, a non-profit corporation, a tax exemption for properties "used for the charitable purpose of providing temporary housing and counseling services to the homeless." *Id.* at 277. Like Advance Housing, Salt and Light purchased residences for the homeless through government funding. *Id.* at 280. Residents in the program received public assistance and paid up to thirty percent of their income as rent depending on their ability. *Id.* at 281. Individuals without resources received housing, and no one was evicted for failure to pay rent. *Ibid.* Salt and Light's case managers played similar roles to Advance Housing's caseworkers. The case managers "met at least twice a week for forty-five minutes to an hour and a half with" the residents and "provided counseling . . . in an attempt to solve the problems that had caused the homelessness," and "the staff provided advice and assistance in obtaining employment and needed services such as medical care, child care, education, [and] job training." *Id.* at 282. The Tax Court determined that the receipt of government subsidies by Salt and Light did not negate its charitable purpose. *Id.* at 291–92. It reasoned that Salt and Light was "not simply a conduit for government subsidies," as its "unique combination of housing and counseling at a lower . . . cost than would otherwise be the case" "lessen[ed] the financial burden on [the] government." *Id.* at 290–91.

However, in *Essex Properties Urban Renewal Assocs., Inc. v. City of Newark,* the Tax Court denied a property tax exemption to a non-profit corporation, Essex Properties, operating an "apartment facility for developmentally and/or physically disabled persons." 20 *N.J.Tax* 360, 361, 371 (Tax 2002). In doing so, the Tax Court distinguished the facts from those in *Salt & Light.* The

Tax Court found that Essex Properties did not establish that (1) it admitted individuals who did not qualify for government aid; (2) that it did not evict tenants who could not afford to pay rent; (3) that it charged below market rent; and (4) that its "on-site social worker" provided the type of "unique combination of housing and counseling" present in *Salt & Light. Id.* at 367. Indeed, the court maintained that Essex Properties' "counseling and support service is incidental to [its] main function, which is to rent apartments to elderly or disabled persons." *Id.* at 367–68. Accordingly, the Tax Court held that Essex Properties did not meet its burden of showing that its "property is used for charitable purposes within the meaning of *N.J.S.A.* 54:4–3.6." *Id.* at 371.

## VI.

From these cases, and others, certain principles can be distilled in guiding courts in making the fact-specific determination whether a non-profit corporation, organized for a charitable purpose, is "actually" using property for a charitable purpose. *See N.J.S.A.* 54:4–3.6. Although all relevant considerations cannot be captured by any list given the ever-changing scenarios that will arise, and although each consideration may not necessarily deserve the same weight, here are some that apply to the circumstances of this case: (1) the charitable work done by the private entity will spare the government an expense that ultimately it must bear, *Presbyterian Homes, supra,* 55 *N.J.* at 285, 261 *A.*2d 143; *see also* Mark A. Hall & John D. Columbo, *The Charitable Status of Nonprofit Hospitals: Toward a Donative Theory of Tax Exemption,* 66 *Wash. L. Rev.* 307, 345 (1991) ("[T]ax exemption exists as a quid pro quo for the production by the private, nonprofit sector of goods and services that absent exemption would be the burden of the government."); (2) the private entity must not be engaged in a seeming commercial enterprise, *Int'l Sch. Servs., supra,* 207 *N.J.* at 18–20, 21 *A.*3d 1166 (discussing *Paper Mill Playhouse, supra,* 95 *N.J.* at 520–21, 472 *A.*2d 517); (3) the property must be used in a manner to further the charitable purpose, *Presbyterian Homes, supra,* 55

*N.J.* at 283, 261 *A.*2d 143; (4) the receipt of government subsidies or funds is not contraindicative of a charitable purpose, *S. Jersey Family Med. Ctrs., Inc. v. City of Pleasantville,* 351 *N.J.Super.* 262, 266, 273–75, 798 *A.*2d 120 (App.Div.2002) (finding that receipt of substantial government grants and "virtually no voluntary charitable contributions" does not negate charitable purpose), *aff'd o.b.,* 176 *N.J.* 184, 821 *A.*2d 1147 (2003); *Salt & Light, supra,* 15 *N.J.Tax* at 291–92; (5) financial support and recognition by the State of a private entity's charitable work may be indicative that its property is used for a charitable purpose, *Paper Mill Playhouse, supra,* 95 *N.J.* at 515, 472 *A.*2d 517; and (6) the private entity in carrying out its charitable mission through the use of its property is addressing "an important and legitimate governmental concern," *Community Access, supra,* 21 *N.J.Tax* at 617, 618–19.

■ More specific to this case, our Tax Court has recognized that the provision of both housing and substantial supportive services that foster the prospect of independent and productive living in the community for the mentally disabled, *Community Access,* and the homeless, *Salt & Light,* meets the standard for a property tax exemption under *N.J.S.A.* 54:4–3.6.

## VII.

In applying these principles and considerations, and the cases discussed, to the facts of this case, we hold that Advance Housing "actually" uses its residences for the charitable purpose set forth in its certificate of incorporation: "to promote and provide permanent normalized community living arrangements for psychiatrically disabled individuals." In doing so, Advance Housing has satisfied the requirements of *N.J.S.A.* 54:4–3.6 and our jurisprudence for a charitable property tax exemption.

Advance Housing is not a commercial enterprise; it is a nonprofit corporation that provides supportive housing to the psychiatrically disabled. Advance Housing receives the fair market value of rent as determined by HUD, not by the private market. All monies allocated to Advance Housing through government

funding or private donations are used solely to achieve its charitable mission. That mission aligns perfectly with the public policy of this State.

The Governor's Task Force on Mental Health described a dysfunctional system in which approximately one-half of the psychiatric patients in New Jersey's hospitals—some 1,000 patients—ready for discharge could not be released because adequate "housing, treatment, and support services" were unavailable. *2005 Task Force Report, supra,* at 6. In 2006, Governor Codey issued Executive Order No. 78, directing that "[t]he financing of [this State's] mental health system should be changed to promote state-of-the-art treatment alternatives," such as "permanent supportive housing." 38 *N.J.R.* 1109(b) (Jan. 13, 2006). In line with the Executive Order, Advance Housing provides permanent supportive housing. Advance Housing is playing a role in fulfilling an articulated State policy of deinstitutionalizing the mentally disabled. In doing so, it also is relieving the State of the expense that it would otherwise bear in housing and caring for the mentally disabled. *See Community Access, supra,* 21 *N.J.Tax* at 617 ("[I]f not for the housing and social services [Community Access] provides to its members, a public facility like Greystone Psychiatric Hospital would have to care for them at public expense."). In providing supportive housing for the mentally disabled at a cost of $20,000 per year, Advance Housing is securing a savings of public monies, for in 2005 it cost an average of $146,000 per year to care for a mentally disabled individual in a state hospital and $60,000 per year in a group home. *See also* Judge David L. Bazelon Ctr. for Mental Health Law, *Permanent Supportive Housing: The Most Effective and Integrated Housing for People with Mental Disabilities,* 4, *available at* http://www.bazelon.org/LinkClick. aspx?fileticket=q6FsuL6o_Jw% 3D&tabid=241 (last visited Sept. 12, 2013) ("The cost of serving a person in supportive housing is half the cost of a shelter, a quarter the cost of being in prison and a tenth the cost of a state psychiatric bed."). Without Advance Housing, many of its clients would be at greater risk of homelessness, placing greater strain on our social services, such as emer-

gency medical care, shelters, and police intervention. *See, e.g.,*
Corp. for Supportive Hous., *The New York/New York Agreement
Cost Study: The Impact of Supportive Housing on Services Use
for Homeless Mentally Ill Individuals* 8 (2001), *available at* http://
shnny.org/uploads/NY–NY_Agreement_Cost_Study_2001.pdf
("The University of Pennsylvania research confirms that the price
of homelessness is … $40,449 per homeless person per year,
primarily in expenditures for psychiatric hospital care, inpatient
hospital care, and emergency shelter care.").

That Advance Housing receives substantial sums of money from
federal and state agencies to purchase housing and deliver sup-
portive services to the psychiatrically disabled does not negate but
rather is supportive of its charitable purpose. Advance Housing
reasonably posits that without the property tax exemption, the
drain on its limited resources will result in fewer placements.
That will mean further delays for the discharge of patients institu-
tionalized in hospitals and perhaps more mentally disabled individ-
uals falling through the cracks of our social safety network
system. Such a scenario runs directly contrary to our State's
public policy.

Like the Appellate Division, we reject the Tax Court's conclu-
sion that organizations like Advance Housing, which have both
residency and services/counseling components, must have "some
institutional aspect to the housing program" to qualify for a tax
exemption under *N.J.S.A.* 54:4–3.6. As explained in the Governor's
*2005 Task Force Report, supra,* one of the requirements of the
Housing First model is that participation is "voluntary" and "not a
condition of tenancy." *Id.* at 108. Moreover, both state and
federal law bar conditioning a psychiatrically disabled person's
continued residency in supportive housing on participation in a
mental-health program. *See N.J.A.C.* 10:37A–1.2 ("No lease or
residential agreement shall contain the provision of mandatory
mental health program participation as a requirement for the
consumer resident to maintain [supportive] housing."); 42
*U.S.C.A.* § 8013(i)(2)(C) ("A supportive service plan for housing

assisted under this section shall permit each resident to take responsibility for choosing and acquiring their own services, to receive any supportive services made available directly or indirectly by the owner of such housing, or to not receive any supportive services."). Accordingly, that Advance Housing does not require its residents to participate in services does not count against conferring tax-exempt status. All of Advance Housing's residents participate voluntarily to receive supportive counseling and assistance in accordance with their respective needs.

The only question before us is whether a non-profit organization's provision of housing and supportive services to the mentally disabled can qualify an organization for tax-exempt status. The answer to that question is yes. Here, Advance Housing has established that its housing and supportive services are fully integrated—one dependent on the other for success—so that its charitable purpose of facilitating "the transition from dependent living to independent living" for individuals with mental illness is a practical goal. *See 2005 Task Force Report, supra,* at 107 ("The basic premise that makes supportive housing successful is the coupling of permanent housing and services.").

The supportive counseling and assistance that Advance Housing provides to its residents is evidently no less than that provided in *Community Access* (supportive housing for the mentally disabled), and in *Salt & Light* (supportive housing for the homeless)—cases in which property tax exemptions were granted. Unlike *Essex Properties, supra,* which had but one social worker on site to address the needs of its low income, physically, and mentally disabled residents, 20 *N.J.Tax* at 367–68, Advance Housing has forty-nine full- and part-time employees, including caseworkers, two part-time psychiatrists, two nurses, and various mental-health professionals. Counseling and supportive service is not "incidental" to Advance Housing's residence component, as it was in *Essex Properties. Id.* at 368.

We reject the municipalities' contention that the provision in Advance Housing's leases that permits eviction for non-payment of

rent should deprive its property of tax-exempt status. That provision is a requirement for funding from HUD's Section 811 program. Nevertheless, Advance Housing has never evicted or attempted to evict a mentally disabled tenant. Its residents pay only thirty percent of their income as rent. Advance Housing cares for its destitute clients; it does not consign them to homelessness if they are unemployed. We will not place Advance Housing in the Catch–22 position of either losing Section 811 funding for not having the eviction provision in the lease or losing a property tax exemption for having one. Our focus must be on how Advance Housing *actually* uses its residences to achieve its charitable purpose. *See N.J.S.A.* 54:4–3.6.

For that reason, we also reject the municipalities' argument that Advance Housing should be denied a property tax exemption for the residences it owns because it supplies supportive services to the mentally disabled in off-site locations. Advance Housing should not be penalized because of the enlarged scope of its laudable activities. There is a shortage of housing for the psychiatrically disabled. That is why various county and state task force reports have expressed alarm at the number of patients whose discharge is delayed for lack of housing and why they have endorsed the need for permanent supportive housing of the type Advance Housing offers. Advance Housing provides services to its clients in their residences—services that help facilitate the transition from institutionalization to independent living. These services, such as assistance with food shopping, apartment maintenance, cooking, paying bills and rent, are integrally related to independent residential living. It is clear that the properties are actually used in support of the charitable mission.

## VIII.

In conclusion, Advance Housing has established that it is a not-for-profit corporation, organized exclusively for a charitable purpose, and that the properties for which it seeks tax exemptions are actually used for the charitable purpose of providing supportive

housing for the mentally disabled. We hold that Advance Housing is entitled to property tax exemptions in each of the defendant municipalities on appeal before this Court.[13] We therefore affirm the judgment of the Appellate Division and remand to the Tax Court for entry of a judgment consistent with this opinion.

*For affirmance and remandment*—Chief Justice RABNER, Justices LaVECCHIA, ALBIN, HOENS, and PATTERSON, Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—7.

*Opposed*—None.

---

[13] We need not address whether an apportionment of the property tax exemption would be required if one or more of Advance Housing's residents refused supportive counseling and services. As noted earlier, all of Advance Housing's residents receive supportive counseling and services.