**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

| | | |
|---|---|---|
| _____ | ) | TAX COURT OF NEW JERSEY |
| CAMDEN COUNTY COUNCIL | ) | DOCKET NO. 011115-2008 |
| ON ECONOMIC OPPORTUNITY, INC., | ) | DOCKET NO. 014496-2010 |
| | ) | DOCKET NO. 014508-2010 |
| Plaintiff, | ) | DOCKET NO. 012170-2013 |
| | ) | DOCKET NO. 012500-2014 |
| v. | ) | DOCKET NO. 011004-2015 |
| | ) | DOCKET NO. 011145-2016 |
| CITY OF CAMDEN, | ) | DOCKET NO. 008348-2017 |
| | ) | DOCKET NO. 008361-2018 |
| Defendant. | ) | |
| _____ | ) | |

Decided: April 18, 2019

Albert M. Belmont, III, Esq. (Bochetto & Lentz, PC, attorneys) for plaintiff

Michelle Banks-Spearman, City Attorney, City of Camden for defendant

DeALMEIDA, J.T.C. (t/a)

This is the court's opinion on the parties' cross-motions for summary judgment in the above-referenced matters challenging the denial of a local property tax exemption for an apartment complex in Camden City (City) for tax years 2008 through 2010, and 2013 through 2018. For the reasons explained more fully below, the court concludes that a portion of the property is exempt from local property taxes pursuant to N.J.S.A. 54:4-3.6, and a portion of the property is not. The court, therefore, grants the taxing district's motion for summary judgment in part, and denies the motion in part, and grants the property owner's cross-motion for summary judgment in part, and denies the cross-motion in part. Further proceedings are necessary to determine the percentage of the property that qualifies for the exemption for each tax year and to adjudicate the property owner's challenge to the amount of the assessments on the property.

I.  Findings of Fact

This opinion sets forth the court's findings of fact and conclusions of law on the parties' cross-motions for summary judgment.  The court's findings of fact are based on the certifications and exhibits submitted on the motions.

In 1964, Congress enacted the Economic Opportunities Act of 1964, 42 U.S.C. §§ 2782 to 2797 (repealed 1981).  The statute was designed to combat poverty in low-income communities, including the City.  The legislation authorized local public and private non-profit groups called community service organizations to carry out community action programs created by the act.

In 1966, plaintiff Camden County Council on Economic Opportunity, Inc. (CCCEO) was incorporated under New Jersey law as a non-profit, community service organization in response to the federal legislation.  In a separate action concerning other parcels in the City owned by CCCEO, the court determined that the organization was organized exclusively for charitable purposes.  The City admits the court's findings on that point are binding here.  CCCEO's by-laws provide that the organization will fulfill its mission by, among other things, "[e]nsuring that Camden County residents gain and maintain accessibility to adequate sanitary and safe housing [with] special emphasis on the construction and[/]or renovation of decent, affordable housing that will increase housing ownership and rental opportunities for low- and moderate-income families[.]"  Approximately eighty percent of CCCEO's funding comes from State and federal grants.  The remaining funding is obtained from private foundations and individuals.

In 2002, CCCEO purchased an eighteen-building, 132-unit, garden-apartment complex, the Sheridan Apartments, in the City for $1.05 million.  The property is comprised of three parcels designated by the municipal tax assessor as Block 445, Lot 1, Block 449, Lot 1, and Block 446, Lot 3 (the subject property).  For tax years 2008 through 2010, the assessor placed an aggregate

2

assessment of $1,200,000 on the three parcels. For tax years 2013 through 2018, the assessor raised the aggregate assessment to $2,704,100.[1]

The court's findings of fact concern October 1, 2007, the operative date for tax year 2008. CCCEO's use of the subject property has been relatively consistent since that time. The findings of fact, therefore, will be determinative of the subject property's eligibility for an exemption for each tax year at issue. As of October 1, 2007, twenty-five units at the subject property were used for transitional housing for people who were homeless or leaving a shelter. CCCEO provided tenants in those units supportive services, including mentoring, training, employment opportunities, and healthcare. Tenants in transitional housing were required to attend the programs and pay a fee equal to one third of their monthly income, but not more than $300, which served as rent. These tenants remained in the program for up to eighteen months. Transitional housing units were not concentrated in any building on the subject property. Nor were particular units reserved for the program, which was also operated by CCCEO at other buildings it owns. The City concedes that if the twenty-five units used for transitional housing were in a single building with no market rate rental units, that building likely would qualify for an exemption.

---

[1] CCCEO intended to apply for low-income tax credits from the New Jersey Housing Mortgage Finance Agency that it could sell to raise funds to renovate the subject property for rental to low-income tenants. As part of the application process, CCCEO was required to enter into a payment in lieu of tax (PILOT) agreement with the City. An agreement requiring a PILOT payment of approximately $105,100 per year for the subject property was approved by the City's governing body on June 13, 2002. A financial agreement pursuant to the Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -22, was executed on the same day between Sheridan Urban Renewal Associates, LP (Sheridan), of which CCCEO is a general partner, and the City, naming Sheridan as the redeveloper of the subject property. In the matters before the court, the parties initially disputed whether the financial agreement and PILOT agreement ever took effect and, if so, whether they remain in effect. CCCEO subsequently informed the court that it does not claim an exemption for the tax years in question based on the agreements. In light of that development, and because this court lacks jurisdiction over any contractual dispute the parties may have with respect to the PILOT and financial agreements, see McMahon v. City of Newark, 195 N.J. 526 (2008), the court makes no findings of fact or conclusions of law regarding the agreements.

3

The remaining 100 apartments were available to anyone to rent. There was no income-related restriction on who may rent those units. Thus, there was no income cap in place. Theoretically, a high-income tenant could rent a unit at the subject property. This was unlikely, however, as it is not disputed that the subject property serves a low-income community.

Tenants not in the transitional housing program were required to execute a written lease and produce a security deposit of one month's rent. Each rental unit was separately metered and tenants were responsible for the cost of utilities. CCCEO notes that most tenants participated in an energy assistance program that covered the cost of utilities with public funds. That program, however, was available to any member of the public who qualified and was not funded by CCCEO. Leases for the unrestricted units permitted CCCEO to evict tenants who did not pay rent. The record contains no evidence of any eviction by CCCEO of a tenant from the subject property.

There was no limit on the amount of rent that could be charged for an apartment not occupied by a tenant in the transitional housing program. CCCEO's October 2007 rent roll shows rents ranging from $300 to $1,150. It is not clear if the $300 rents were for tenants in the transitional housing program. The parties dispute whether the rents on the non-transitional units were at or below market rates. The submissions from both parties on this point are largely inadmissible hearsay. In addition, approximately ten Section 8 units were assigned to the subject property and approximately six other units were occupied by tenants with portable Section 8 certificates. The City contends that the Section 8 program paid CCCEO market rents, although the record contains insufficient proof or a legal citation to support that assertion. However, as will be explained in more detail below, it is not necessary for the court to determine whether the subject property garnered market rent on the units not being used for the transitional housing program. The crucial fact, which is undisputed, is that the units not being used for the transitional housing

4

program were rented without regard to the tenant's income and without regulatory or self-imposed restrictions on the rent CCCEO charged for those units.

All tenants at the subject property were permitted to participate in various programs operated by CCCEO, but were not required to do so. The organization operated an energy assistance program, training and mentoring services, a matching funds program to assist individuals in realizing the goal of homeownership, a community employment program, including employment at the subject properties, homeownership counseling, and other services. CCCEO did not maintain space at the subject property to offer these social and financial services, some of which were provided at other properties owned by CCCEO. The programs were also open to individuals who did not rent units at the subject property. On its 2008 federal 990 tax return, CCCEO reported receiving $6,737,319 in government grants and $862,768 in "program service revenue" from renting apartments at the subject property as its only revenue for that year.

For each tax year at issue, CCCEO sought an exemption from local property taxes pursuant to N.J.S.A. 54:4-3.6, alleging that the subject property was used for charitable purposes. The municipal tax assessor denied the exemption requests. In each tax year, CCCEO filed a petition of appeal with the Camden County Board of Taxation challenging the assessor's denial of an exemption, as well as the amount of the assessments placed on each parcel. In each tax year, the county board issued judgments affirming the assessments. CCCEO filed timely complaints in this court with respect to each tax year, alleging that the subject property qualifies for an exemption and that the assessments on each parcel exceeds its true market value.

The parties thereafter filed cross-motions for summary judgment with respect to the exemption issue. CCCEO's challenge to the amount of the assessments on the subject property is not addressed in the motions.

5

## II. Conclusions of Law

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Rule 4:46-2 (c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995), our Supreme Court established the standard for summary judgment as follows:

> [W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.

"The express import of the Brill decision was to 'encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.'" Twp. of Howell v. Monmouth Cty. Bd. of Taxation, 18 N.J. Tax 149, 153 (Tax 1999) (quoting Brill, 142 N.J. at 541).

Because they represent a departure from the fundamental approach that all property owners bear their fair share of the local property tax burden, "[t]ax exemption statutes are strictly construed, and the burden of proving entitlement to an exemption is on the party seeking it." Abunda Life Church of Body, Mind & Spirit v. City of Asbury Park, 18 N.J. Tax 483, 485 (App. Div. 1999) (citing N.J. Carpenters Apprentice Training and Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 177-78 (1996); Princeton Univ. Press v. Borough of Princeton, 35 N.J. 209, 214 (1961)). "[A]ll doubts are resolved against those seeking the benefit of a statutory exemption[.]" Borough of Chester v. World Challenge, Inc., 14 N.J. Tax 20, 27 (Tax 1994) (quoting Twp. of Teaneck v. Lutheran Bible Inst., 20 N.J. 86, 90 (1955)). These standards, however, do "not justify

distorting the language or the legislative intent" of the exemption statute. Boys' Club of Clifton, Inc. v. Twp. of Jefferson, 72 N.J. 389, 398 (1977).

N.J.S.A. 54:4-3.6 provides an exemption from local property taxation for

> all buildings actually used in the work of associations and corporations organized exclusively for . . . charitable purposes, provided that if any portion of a building used for that purpose. . . is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion shall be exempt from taxation, [as well as] the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed five acres in extent . . . provided . . . the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them . . . are not conducted for profit, except that the exemption of the buildings and lands used for charitable . . . purposes shall extend to cases where the charitable . . . work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided the building is wholly controlled by and the entire income therefrom is used for said charitable . . . purposes[.]

In addition, the exemption applies only

> where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed[.]
>
> [N.J.S.A. 54:4-3.6.]

The statutory criteria for a charitable exemption are properly summarized as follows. A claimant must demonstrate that: (1) it owns the property; (2) it is organized exclusively for charitable purposes and is authorized to conduct the activities for which the property is used; (3) the property was actually used for the tax exempt purpose; and (4) the operation and use of the property was not conducted for profit, although fees may be collected from or on behalf of the beneficiaries of the charitable services, provided revenue from the fees are used to further the

7

organization's charitable purposes.  See Essex Props. Urban Renewal Assocs. v. City of Newark, 20 N.J. Tax 360, 364 (Tax 2002).

Three of the four factors are not contested here.  CCCEO's ownership of the subject property is undisputed.  In addition, as noted above, the City acknowledges that the court previously found that CCCEO was organized exclusively for charitable purposes.  There is no dispute that CCCEO is authorized to conduct the activities for which it uses the subject property.  Finally, the City concedes that the subject property is not operated or used for profit.  The sole issue before the court is whether the subject property is actually used for charitable purposes.

As the Supreme Court explained almost fifty years ago,

> [w]e have not previously had occasion to define "charitable purposes" as used in N.J.S.A. 54:4-3.6.  Courts of other states with similar statutes have defined "charitable purposes" as:
>
> > [A]n application of property for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering and constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens on government.
>
> [The Presbyterian Homes of the Synod of N.J. v. Div. of Tax Appeals, 55 N.J. 275, 284 (1970) (footnote and emphasis omitted) (second alternation in original) (quoting Coyne Elec. Sch. v. Paschen, 146 N.E. 2d 73, 79 (Ill. 1957)).]

Adopting this definition, the Court held that "the term 'charity' in a legal sense is a matter of description rather than a precise definition."  Id. at 285.  "Therefore, the determination of whether property is devoted to a charitable purposes depends upon the facts or circumstances of each case."  Ibid.

8

More recently, the Court expanded on the factors to be considered when determining whether a use of property is charitable:

> Although all relevant considerations cannot be captured by any list given the ever-changing scenarios that will arise, and although each consideration may not necessarily deserve the same weight, here are some [to be considered]: (1) the charitable work done by the private entity will spare the government an expense that ultimately it must bear; (2) the private entity must not be engaged in a seeming commercial enterprise; (3) the property must be used in a manner to further the charitable purpose; (4) the receipt of government subsidies or funds is not contraindicative of a charitable purpose; (5) financial support and recognition by the State of a private entity's charitable work may be indicative that its property is used for a charitable purpose; and (6) the private entity in carrying out its charitable mission through the use of its property is addressing an important and legitimate governmental concern[.]
>
> [Advance Hous., Inc. v. Twp. of Teaneck, 215 N.J. 549, 572-73 (2013) (citations and quotation omitted).]

CCCEO argues the subject property qualifies for an exemption because it is used to provide housing to low-income residents, to whom the organization offers a panoply of services at the subject property and at other properties CCCEO owns in the City. Those services are designed to assist residents in obtaining homeownership and financial independence. CCCEO asserts that its transitional housing program helps alleviate homelessness, which benefits the participants and relieves government obligations. CCCEO points out that the subject property is viewed as a residence of last resort and courts frequently order CCCEO to house individuals in emergent situations, fulfilling a function that would otherwise be the State's responsibility. In addition, CCCEO argues that the units not being used for transitional housing are rented to low-income individuals, which addresses the public need to provide affordable housing.

The City, on the other hand, argues that an exemption is not warranted because CCCEO uses the subject property largely to operate a market-rate apartment complex in a low-income

9

market. While the City recognizes that twenty-five units at the subject property are used for transitional housing for qualified tenants, it contends that the remaining apartments are rented in the open rental market to any tenant regardless of income, need for services, or participation in services. The City notes that approximately fifty percent of the units at the subject property were occupied when CCCEO purchased the parcels from a commercial landlord in 2002, and that the existing tenants were permitted to remain in their rent control apartments without any inquiry into their income or obligation to participate in CCCEO services.

The City argues that while it is admirable that CCCEO provides housing at low rates, the organization is, in effect, competing with other landlords in Camden who provide housing in low-income neighborhoods and whose properties are not exempt from local property taxes. According to the City, a large number of its residents live below the federal poverty level and rent apartments at the low end of the market because of a lack of resources. The City argues that because at least 100 apartments at the subject property are rented to tenants who may or may not participate in the organization's financial and social programs, and who are not subject to an income cap or other income-based restrictions, CCCEO is no different than any other landlord with low-rent apartments and its property does not qualify for an exemption.

The Supreme Court's holding in Advance Housing guides this court's analysis. In that case, the property owner provided rental "housing with integrated supportive services to mentally disabled citizens, who otherwise would be dependent on government relief," at residences purchased with federal, State and private funds. Id. at 553-54. Eligibility for housing was established by federal and State regulations, requiring residents to "meet a statutory definition of homelessness" or "come from a state hospital or a group home." Id. at 556. The tenants had "experienced periods of institutionalization, psychiatric hospitalization, or homelessness or risk of

10

homelessness due to a psychiatric disability." Ibid. The property owner received market rent "as determined by" the federal government, with residents paying thirty percent of their income as rent and the balance coming from public funds. Ibid. The property owner retained the right to evict for failure to pay rent, although there was no evidence that an eviction had ever been attempted. Id. at 557.

The property owner provided services to its tenants both at the properties under review and at other properties. Among the services provided were counseling, vocational guidance, crisis intervention, transportation, and assistance with all aspects of daily living. Id. at 558. If a tenant's psychiatric condition warranted, the property owner could temporarily become the tenant's representative payee for government benefits and take control of their finances for purposes of paying rent and daily living expenses. Ibid. The property owner had forty-nine full- and part-time employees, including caseworkers, nurses, psychiatrists, and mental-health professionals available to provide services to tenants. Ibid. Staff members worked seven days a week and were available on an on-call basis after working hours. Ibid.

Every tenant was required to execute a written agreement and plan detailing the services that the property owner would provide. Ibid. "The nature, degree, and duration of the services depend[ed] on the needs of the individual client[,]" with some receiving services as much as seven times a week. Ibid. The leases gave the property owner the right to terminate "if the client no longer needs supportive and counseling services or if the services are inadequate to meet the client's needs." Id. at 557. Both the federal and State governments prohibited the property owner from requiring tenants to accept supportive services as a condition of residency because, from a treatment perspective, "an unwilling participant is considered counterproductive to the goal of developing independence and trust." Id. at 557-58.

11

"[T]he cost of funding a psychiatrically disabled individual in a residence" at the properties in question was "far less than the cost of institutionalizing that individual in a State facility." Id. at 559. In addition, the housing and supportive services model employed at the properties was consistent with recommendations in various government reports addressing a crisis in available housing for people eligible for discharge from State hospitals, but unable to secure a place to live. Ibid.

The Tax Court denied an exemption because the property owner's provision of housing was separate from its supportive services. Id. at 561. The court found that providing subsidized housing is not, standing alone, a charitable use of property, but that an integrated program of housing and supportive counseling would be an exempt use. Ibid. The court reasoned that because tenants at the Advance Housing properties were not compelled to participate in the services offered at the properties there was no charitable use. Ibid. The court relied, in effect, on the absence of an institutional setting as the reason to deny an exemption. Ibid.

The Supreme Court rejected this approach, concluding instead that the property owner's "housing and supportive services are fully integrated – one dependent on the other for success – so that its charitable purpose of facilitating the transition from dependent living to independent living for individuals with mental illness is a practical goal." Id. at 576 (quotation omitted). Because federal and State law prohibited the property owner from requiring tenants to participate in services as a condition of residency, the Court held that the lack of such a requirement "does not count against conferring tax-exempt status." Ibid. In addition, the Court found that the property owner was "playing a role in fulfilling an articulated State policy of deinstitutionalizing the mentally disabled" and "relieving the State of the expense that it would otherwise bear in housing and caring for the mentally disabled." Id. at 574.

The Court noted that its holding was consistent with a number of precedents. Id. at 576 (citing Cmty. Access Unlimited, Inc. v. City of Elizabeth, 21 N.J. Tax 604 (Tax 2003) (exemption applies where property owner provides subsidized housing and services to individuals with mental disabilities); Salt & Light Co. v. Twp. of Mt. Holly, 15 N.J. Tax 274 (Tax 1995) (exemption applies where property owner provides temporary housing and counseling services to the homeless), aff'd o.b., 16 N.J. Tax 40 (App. Div. 1996); and Essex Props. Urban Renewal Assocs., Inc. v. City of Newark, 20 N.J. Tax 360, 367-68 (Tax 2002) (exemption does not apply where "counseling and support service is incidental to [the] main function, which is to rent apartments to elderly or disabled persons")).

Application of the holding in Advance Housing to the facts of this case leads to the conclusion that CCCEO's use of a portion of the subject property for its transitional housing program satisfies the statutory criteria for an exemption as a charitable use. The program provides housing for tenants at risk of homelessness, some of whom are recently released from a shelter. In addition, the courts direct individuals in need of emergent housing to the subject property. The program participation fee is based on the tenant's income, and is capped at a low amount. CCCEO provides a number of services to program participants designed to assist them in gaining financial stability and permanent housing. These goals comport with CCCEO's charitable purpose and, to the extent they are successful, relieve the State of the costs it would almost certainly incur as a result of the tenants' return to homelessness.

The City, in effect, concedes that the use of the subject property for transitional housing satisfies the statutory requirements for an exemption. Although the City qualified its position by stating that an exemption would likely apply only if the transitional units were in a single building with no market rental units, the court finds this distinction to be legally insignificant. N.J.S.A.

13

54:4-3.6 expressly provides that a property may qualify for a partial exemption when it is put to both charitable and non-charitable uses, provided the remaining statutory requirements are met. Courts have directed that a parcel be treated as partially exempt and partially subject to tax. See e.g., Phillipsburg Riverview Org., Inc. v. Town of Phillipsburg, 26 N.J. Tax 167 (Tax 2011) (granting partial exemption for charitable use, while concluding that the remainder of the property was not exempt), aff'd, 27 N.J. Tax 188 (App. Div. 2013). There is no statutory requirement that a property owner must concentrate its charitable use in a particular structure or on a single parcel to qualify for an exemption. Thus, CCCEO's use of available units, regardless of the building in which they are located, for its transitional housing program does not defeat an exemption.

The court agrees with the City, however, that the portions of the subject property not used by CCCEO for its transitional housing program do not satisfy the statutory criteria for an exemption. It is undisputed that when CCCEO purchased the subject property from a commercial landlord a significant portion of the units were occupied by tenants who rented the units in the commercial market. CCCEO allowed those tenants to remain. CCCEO did not undertake an analysis of the income of those tenants, impose any income-based restrictions on their continued occupancy, or alter their monthly rent to reflect their income. Those tenants were instead permitted to continue with what was a tenancy on terms obtained in the marketplace prior to CCCEO's purchase of the subject property. While those tenants were permitted to participate in CCCEO's programs, their tenancy was not predicated on their participation. The programs were available to those tenants on the same terms as were afforded all members of the public.

In addition, CCCEO continued to rent units not being used for the transitional housing program to tenants on terms negotiated in the open market. No statutory, regulatory, or self-imposed rules or practices limit who may rent an available unit at the subject property. Rental

rates are not limited or defined, except by any applicable rent control regulations. It matters not whether CCCEO obtains rents at or below market. There is no formal procedure in place at the subject property to determine monthly rent for those not in the transitional housing program based on the tenant's income. There is no cap on rent for those units. CCCEO can obtain whatever rent the market will bear.

The court recognizes that the tenants at the subject property who are not participating in the transitional housing program likely have limited income. As a result, the rents obtained by CCCEO may be low. Whether they are lower than market, however, depends not on the organization's charitable intent, government funding, or the terms of a particular program designed to achieve a charitable objective. Low rents at these units are a reflection of the market which the subject property serves. In this regard, the subject property directly competes with other property owners who serve the rental needs of the low-income community in the City without the benefit of a tax exemption. See Twp. of Weymouth v. Mem'l Park Family Practice Ctr., Inc., 7 N.J. Tax 589 (Tax 1985) (denying exemption where a property is in direct competition with commercial properties offering the same service).

The provision of rental apartments to this segment of the market, while assisting in addressing what is undoubtedly a public need for affordable housing, does not qualify a property for a tax exemption. The Legislature has enacted a number of programs to encourage the construction and maintenance of affordable housing, which may include relief from local property taxes. See e.g., Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -22, and the New Jersey Housing Mortgage Finance Agency Act, N.J.S.A. 55:14K-1 to –93. CCCEO does not contend that its use of the subject property comports with those statutory provisions. Renting homes to low-

income tenants, while laudable, does not, standing alone, qualify for an exemption from local property taxes.

The court will enter an order granting an exemption to those portions of the subject property used by CCCEO for its transitional housing program as of October 1 of each year preceding a tax year under review, as well as a proportionate share of the common areas of the subject property, and denying an exemption for the remainder of the subject property. The precise allocations for each tax year and CCCEO's challenge to the amount of the assessments on the subject property for each tax year remain pending.

16