**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF**

**THE TAX COURT COMMITTEE ON OPINIONS**

| | | |
|---|---|---|
| **Township of Green**, a municipal Corporation of the State of New Jersey, | : | TAX COURT OF NEW JERSEY DOCKET NOS.:009572-2016; 009068-2018 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | | |
| **Life With Joy, Inc.**, A New Jersey non-profit corporation | : : | |
| | : | |
| Defendant. | : | |
| | : | |

Approved for Publication
In the New Jersey
Tax Court Reports

| | | |
|---|---|---|
| **Life With Joy, Inc.**, A New Jersey non-profit corporation | : : | TAX COURT OF NEW JERSEY DOCKET NOS.:008566-2017;013541-2019; |
| Plaintiff, | : | 010728-2020 |
| | : | |
| v. | : | |
| | : | |
| **Township of Green**, a municipal Corporation of the State of New Jersey | : : | |
| | : | |
| Defendant. | : | |
| | : | |

Decided: March 24, 2022

Robert B. McBriar for Township of Green, (Schneck, Price, Smith, & King, LLP., attorneys)

Jay J. Freireich for Life with Joy, (Freireich, LLC., attorney)

BIANCO, J.T.C.

*

This shall constitute the court's formal opinion[1] concerning consolidated appeals from various decisions of the Sussex County Board of Taxation ("County Board") concerning the tax-exempt status under N.J.S.A. 54:4-3.6, of property owned by Life with Joy ("LWJ") located within the Township of Green ("Township") at 3 Fox Run, and designated by the taxing district as Block 18 Lot 67 ("Subject Property"). Specifically at issue is whether or not the Subject Property is actually used in furtherance of LWJ's charitable purpose, and whether or not it is impermissibly used to make a profit. LWJ has appealed the County Board's denials of a tax exemption for Tax Years 2017, 2019, and 2020. The Township appealed the County Board's decisions to grant the exemption in Tax Years 2016 and 2018.

For the reasons more specifically set forth herein, the court: (1) grants LWJ's appeals for 2017 and 2020, reversing the judgments of the Board, finding that LWJ has met its burden of satisfying the elements of N.J.S.A. 54:4-3.6 (2) denies the Township's 2016 and 2018 appeals, affirming the judgments of the County Board; and (3) dismisses LWJ's 2019 appeal for lack of jurisdiction.

STATEMENT OF UNDISPUTED FACTS

LWJ is a nonprofit New Jersey Corporation and a Federal 501(c)(3) Organization created in 2014 by Susan and Gary Kolb (collectively the "Kolbs"), who are married to each other, to be a living and learning center for young adults with developmental disabilities. Ms. Kolb[2] serves as executive director of LWJ and is president of the board of trustees. As president, Ms. Kolb ensures LWJ stays true to its mission to provide living arrangements and life skills training to young adults

---

[1] Judge Novin, J.T.C. was recused from participation in the Tax Court Committee on Opinions concerning this matter.

[2] Ms. Kolb was the only witness for LWJ and her trial testimony was generally undisputed by the Township.

with developmental disabilities, primarily autism. In 2015 LWJ purchased the Subject Property largely with the Kolbs' inheritance.

The Subject Property is comprised of a two-story five-bedroom house on about three and a half acres. LWJ uses the house in furtherance of its goals to provide living arrangements and life skills training to young adults with developmental disabilities. The house has a 2,000 square foot basement with a full gym, a six-person capacity movie theater, a craft area, and a storage pantry where clients can practice warehouse skills. They cook meals in the kitchen and eat in the dining room. The house also contains a makeshift green house, a chess room, and a library. LWJ maintains an office in the house to comply with the Division of Developmental Disabilities' (DDD) rules.[3]

To facilitate the management of LWJ, the Kolbs entered into an automatically renewing lease with LWJ on October 1, 2015, by which the Subject Property became, and continues to be, their primary and only residence. They live there as full-time caregivers to LWJ's clients. Their starting rent was $1,500 with an automatic yearly increase of $25. LWJ pays for utilities, cable, and internet. The Kolbs and all other residents make use of these amenities.

At present, LWJ has two clients leasing rooms.[4] The Kolb's son has leased since LWJ acquired the property. Another individual has a lease with LWJ, which runs from August 1, 2021, through July 31, 2022, at a rate of $2,790 per month. One bedroom is deliberately kept open for

---

[3] The specifics of the DDD program are set forth in a brochure entitled, <u>A Quick Guide for Families</u>, developed by The New Jersey Department of Human Services, Division of Developmental Disabilities, in collaboration with Regional Family Support Planning Councils of which the court takes judicial notice. N.J. Division of Developemtntal Disabilities, https://www.state.nj.us/humanservices/ddd/assets/documents/quick-guide-for-families-english.pdf (last visted Mar. 9, 2022). The DDD program is discussed in more detail <u>infra</u>.

[4] For their privacy, the court did not list the names of the clients of LWJ.

3

residents' family visits, or respite. Respite is an opportunity for individuals with developmental disabilities to stay at the Subject Property temporarily in other to take a break from their current living situation, or to provide an individual the necessary care and safety precautions while that individual's regular care provider takes a break.

Over the years, multiple clients have spent varying amounts of time living at the Subject Property, however, not all of them are evidenced by leases. For instance, one individual moved in to the Subject Property at the end of 2019. Two other individuals spent time renting at LWJ in its early years as well.

In addition to their full-time residential clients, LWJ hosts several clients on a daily basis at the Subject Property. Regardless of residential status, clients pay for the activities and services in a similar manner. Once an individual with developmental disabilities becomes twenty-one, they are required by DDD eligibility requirements to take a state administered NJ Comprehensive Assessment Tool (NJCAT). The DDD uses the NJCAT to evaluate an individual's support needs. The NJCAT's results also determine an individual's annual budget amount from DDD. In order for clients to pay LWJ *via* their DDD budgets, LWJ first had to be certified by DDD. In 2017, LWJ applied for DDD certification, and after correcting issues discovered by an audit, LWJ secured DDD certification in 2018.

Once funding is secured, a support coordination agency is selected which helps write a program that LWJ must follow. From the program, the client creates a personal budget in which they determine what services they will require or activities they will participate in. LWJ must then keep notes and maintain records as to how LWJ is working to further the individual's program and achieve their goals.

Even before LWJ obtained DDD certification, LWJ paid the teachers. Originally LWJ used the Kolbs' inheritance to pay the teachers 100 dollars per hour. When the inheritance ran out, Ms. Kolb explained that they would pass a hat around to collect money for the teachers.

One of LWJ's goals is to find a place for their clients to work. In furtherance of that mission, LWJ emphasizes pre-vocational and vocational skills. Ms. Kolb explained that pre-vocational classes simply teach job skills. LWJ's primary pre-vocational focus is gardening because the Kolbs discovered that gardening is tailored to specific habits of people on the autism spectrum. Accordingly, LWJ uses its four gardens, the green house, and a myriad of houseplants to teach responsibility and healthy eating habits. From the fruits of their labor, under supervision, clients at the LWJ house prepare meals and snacks. To facilitate these programs and activities, LWJ relies on staff and volunteers.

LWJ hosts activities and facilitates classes throughout the week, and while each activity may not happen every day, Ms. Kolb maintained that the whole of the Subject Property is used all the time every day. Ms. Kolb testified that there is always someone at the Subject Property because it is never really closed. Generally, over the weekends there are three to four people at the Subject Property, but for special events they can host between twelve and fourteen individuals.

A typical day at LWJ consists of the clients engaging with one another and their community. This can be through off-site hikes, trips to the store or restaurants, or horseback riding. Clients may also exercise, cook, practice social skills, and make podcasts on the Subject Property. Some days, LWJ hosts a drum circle or an African drumming class with dancing to provide an opportunity for parents and clients to participate in activities together. Residents and clients do not need to participate in every activity and class.

In 2016 and 2017, LWJ hosted classes at the Subject Property. However, in November 2016, the Township sent LWJ a letter informing them that they were violating zoning laws by charging for classes conducted on the Subject Property. The letter also explained that LWJ did not have any of the necessary permits to make food and host parties on the Subject Property and any commercial use of the Subject Property violated the Township's zoning ordinance. In response, LWJ moved some of their classes to the nearby Western Hills Christian Church. Dissatisfied with that response, the Township sent LWJ a notice of violation on May 23, 2018. The notice outlined the specific alleged zoning violations. Ms. Kolb testified that they did not go to the Zoning Board or any other municipal authority prior to purchasing the Subject Property because they had spoken to the mayor and were under the impression that they had the Township's blessing to use the Subject Property in the way they intended.

Paying no heed to the Township's May 2018 letter, LWJ continues to use the Subject Property with clients for other activities. Notably, clients use the basement gym facilities with the help of private trainers and personal aides. These trainers and aides are getting paid for their work on the property through the clients' personal state budget *via* the DDD programs. The personal trainers are not LWJ employees but rather 1099 contractors. While the aides and trainers are not restricted to the spaces in which they work, they have no reason to go upstairs into the residents' living quarters.

There is no evidence before the court that LWJ is being fined by the Township for its alleged zoning violations, or that the Township, (other than its May 2018 letter) has taken any action to put a stop to the activities of LWJ on the Subject Property.

**Procedural History**

Pending before this court are appeals for Tax Years 2016, 2017, 2018, 2019, and 2020. The County Board granted LWJ the tax exemption in 2016 and 2018 and the Township appealed that decision for each year. The County Board denied the exemption in 2017,[5] 2019,[6] and 2020;[7] LWJ appealed, or attempted to appeal, the denial each year. While this court sits *de novo* on appeals from County Boards, it is worth noting that after 2016, the County Board opined that it was not within their power to resolve the zoning dispute[8] and because the Tax Court already had this matter pending before it, the County Board continued to defer its judgment on the issue.

**APPLICABLE LAW**

A. Generally

"N.J.S.A. 2A:3A-4b directs this court to hear and determine all issues of fact and law *de novo*." Chevron U.S.A., Inc. v. City of Perth Amboy, 9 N.J. Tax 571, 581 (Tax 1988). "By use of the term *de novo* the Legislature intended that this court consider an original assessment completely anew" as a court of original, rather than appellate jurisdiction. Ibid. Notwithstanding, "[i]n a proceeding in the Tax Court there is a presumption of correctness in favor of the County Board judgment which must be overcome by plaintiff's introduction of sufficient competent

---

[5] County Board Judgment code 2B, "presumption of correctness not overturned."

[6] County Board Judgment code 5E, "appeal not timely filed."

[7] County Board Judgment code 6A, "tax court pending."

[8] After the Township's attorney explained to the County Board during the 2018 appeal hearing discussing the 2017 exemption, that "the property exemption statute is not the vehicle for showing a soft heart," the County Board remarked that "someone needs to draw the line as to where [the charitable exemption starts and stops], [and] this board is not going to draw that line."

evidence." Glen Wall Assoc. v. Wall Twp., 6 N.J. Tax 24, 28 (Tax 1983), rev'd on other grounds, 99 N.J. 265 (1985).

B.      Property Tax Exemption

N.J.S.A. 54:4-3.6 provides in pertinent part that:

> The following property shall be exempt from taxation . . . all buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, provided that if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt.

[N.J.S.A. 54:4-3.6]

While value determinations by County Boards generally enjoy a presumption of validity, MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998), "the determination of an exemption is more properly one of statutory and case law interpretation than one requiring any special expertise possessed of an assessor[;] . . . 'statutory construction is ultimately a judicial function.'" Hertz v. Borough of Lincoln Park, 31 N.J. Tax 1, 12 (Tax 2019) (quoting O'Rourke v. Fredon, 25 N.J. Tax 443, 450 (Tax 2010)). "[T]ax exemption cases . . . are necessarily limited to their facts and are not controlling." AHS Hosp. Corp. v. Town of Morristown, 28 N.J. Tax 456, 499 (Tax 2015) (citing Int'l Schs. Servs., Inc. v. West Windsor Twp., 207 N.J. 3, 22 (2011)).

"The Supreme Court of New Jersey has set forth three criteria for whether a property qualifies for exemption under N.J.S.A. 54:4-3.6: (1) the owner of the property must be organized exclusively for the tax-exempt purpose; (2) the property must be actually used for the exempt purpose; and (3) the operation and use of the property must not be conducted for profit." Borough of Hamburg v. Trs. of Presbytery of Newton, 28 N.J. Tax 311, 318 (citing Paper Mill Playhouse

8

v. Millburn Twp., 95 N.J. 503, 506 (1984)). "Each of these prongs is respectively referred to as (1) the "organization test," (2) the "use test," and (3) the "profit test." Ibid.

It has long been recognized that "all property shall bear its just and equal share of the public burden of taxation." Princeton Univ. Press v. Borough of Princeton, 35 N.J. 209, 214 (1961). "Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption." Ibid. Accordingly, "[t]he burden of proving a tax-exempt status is upon the claimant." Ibid. However, "[t]he rule of strict construction must never be allowed to defeat the evident legislative design." Soc'y of the Holy Child Jesus v. City of Summit, 418 N.J. Super. 365, 373 (App. Div. 2011) (quoting N.J. Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 177-78 (1996)).

When determining whether a property is actually used for a tax-exempt purpose, the Tax Court evaluates whether the property is "reasonably necessary" for such tax-exempt purposes. See Roman Catholic Archdiocese of Newark v. East Orange City, 18 N.J. Tax 649, 653 (App. Div. 2000) (citing City of Long Branch v. Monmouth Med. Ctr., 138 N.J. Super. 524, 532 (App. Div. 1976), aff'd, 73 N.J. 179 (1977)). When applying this test, the Court has held that "necessary" is not interpreted to mean "absolutely indispensable." Boys' Club of Clifton, Inc. v. Twp. of Jefferson, 72 N.J. 389, 401 (1977). Eligibility for exemption is determined as of October 1 of the prior tax year. See Catholic Relief Servs., U.S.C.C. v. South Brunswick Twp., 9 N.J. Tax 25, 26-7 (Tax 1987), aff'd, 9 N.J. Tax 650 (App. Div. 1987).

The test for whether property is used for profit is a "pragmatic inquiry into profitability . . . [A] realistic common-sense analysis of the actual operation of the taxpayer; mechanical centering on income and expense figures is to be avoided." Paper Mill Playhouse v. Millburn Twp., 95 N.J. 503, 521 (1984). While N.J.S.A. 54:4-3.6 requires that the operation and use of property not be

9

conducted for profit, there is "nothing in the statute requiring, as a condition of tax exemption, that [an entity] must actually operate at a loss[.]" Trenton v. State, Div. of Tax Appeals, 65 N.J. Super. 1, 10 (App. Div. 1960). "A crucial factor is where the profit goes . . . 'If [the court] can trace it into someone's personal pocket [the nonprofit] [will not be] entitled to tax exemption.'" Paper Mill, 95 N.J. at 522 (quoting Trenton, 65 N.J. Super. at 12).

"A narrow exception to the profit-making prohibition of N.J.S.A. 54:4-3.6 [is the *de minimis* rule which explains] an occasional or incidental nonexempt activity, or a regular nonexempt activity which is of an inconsequential or *de minimis* character will not preclude an organization from obtaining tax exemption for its otherwise tax-exempt property." Greenwood Cemetery Ass'n of Millville, Inc. v. City of Millville, 1 N.J. Tax 408, 414 (Tax 1980). *De minimis* activities are "an occasional or incidental activity, or, if engaged in regularly, one which is of an inconsequential . . . character[,]" not "substantial, independent and permanent endevors specifically designed to make a profit[.]" Princeton Univ. Press, 35 N.J. at 217. Furthermore, when "the taxpayer complies with the requirements of [N.J.S.A. 54:4-3.6], it is entitled to the exemption from real property taxes even if the use of the property does not comply with the municipal zoning ordinance." Soc'y of the Holy Child Jesus, 418 N.J. Super. at 368.

C. Appealing County Board Decisions

"Any party who is dissatisfied with the judgment, action or determination of [the County Board] may seek review of that judgment, action or determination in the Tax Court by filing a complaint in the Tax Court, pursuant to rules of court." N.J.S.A. 54:51A-1(a). The deadline for filing tax appeals in New Jersey is on or before April 1, or 45 days from the date the bulk mailing of notification of assessment is completed in the taxing district, whichever is later. N.J.S.A. 54:3-

21. A complaint to review a County Board judgment must be filed within 45 days of service of the judgment. N.J.S.A. 54:51A-1(a); R. 8:4-1(a)(2).

"Without timely filing of review petitions a county tax board . . . is without jurisdiction to grant the review sought." Danis v. Middlesex Cty. Bd. of Taxation, 113 N.J. Super. 6, 10 (App. Div. 1971)). "The failure to file a timely appeal is a fatal jurisdictional defect." Lamantia v. Howell Twp., 12 N.J. Tax 347, 351 (Tax 1992). These rules must be strictly enforced so that municipal governments may "ascertain the amount of taxable ratables within [their] jurisdiction in order that [they] might adopt a responsible and fairly accurate budget." Galloway Twp. v. Petkevis, 2 N.J. Tax 85, 92 (Tax 1980).

### D. Credibility of Witnesses

The court must base its findings on its own credibility determinations. See Judson v. Peoples Bank & Trust Co., 17 N.J. 67, 75 (1954), superseded by statute, N.J.S.A. 2A:15-5.1 (unrelated to the credibility considerations). When the facts are undisputed such as here, the court is well within its authority to weigh the witness's credibility and establish the facts supporting the outcome. See Scott v. Salerno, 297 N.J. Super. 437, 447 (App. Div. 1997) (stating that "parties cannot complain that the trial court took as true facts which were not contested or challenged"), certif. denied, 149 N.J. 409 (1997).

Without creating a bright-line rule, this court has concluded that credible testimony is "forthcoming" with "detail[s]" and includes helpful "factual back-up information." See AHS Hosp. Corp., 28 N.J. Tax at 469, 470 (where the court found witness' testimony "at times to be less than forthcoming, and often lacking sufficient support or foundation . . . often prompted by leading questions on direct examination, and [the witnesses'] memory and recollection of details, facts, and events, particularly on cross-examination, were somewhat selective"); See also Hertz,

11

31 N.J. Tax at 17-20 (where the Tax Court found the applicant's exemption application to be "substantially inconsistent with the evidence [at trial] . . . [and it was] the extent of those inconsistencies [that lead the court] to conclude that [the applicant's] testimony was substantially not credible and self-serving.")

## ANALYSIS

LWJ's status as a charitable organization is uncontested and therefore, the court's review of LWJ's property tax exemption qualifications is limited to the second and third prong of the Paper Mill test: (1) is the Subject Property actually used for the charitable purpose; and (2) is the Subject Property impermissibly used to make a profit. For reasons more fully stated below, the court finds that LWJ satisfied its burden in showing that the Subject Property is used in furtherance of the organization's charitable purpose. Furthermore, because the non-charitable profit-generating use of the Subject Property is *de minimis*, this court finds that the Subject Property statisfies the profit test. Additionally, LWJ's 2019 tax appeal is dismissed for lack of jurisdiction, and the Township's zoning argument, while unenforceable under current law, is not wholly without merit.

### 1. The Use Test

Courts have established that the use test does not impose a quantum of use. E.g., Roman Catholic Archdiocese of Newark, 17 N.J. at 311 (reasoning that "no courts in this state have ever suggested that the quantum, regularity, or consistency of religious activity are necessary prerequisites to [tax exemption]"); Borough of Hamburg v. Trs. of Presbytery of Newton, 28 N.J. Tax 311, 320 n.5 (Tax 2015) (explaining that the court need not "examine the 'quantum of use' of a property under the exemption requirements of N.J.S.A. 54:4-3.6"). In Borough of Hamburg, the court found that "the use of the [Subject Property] to store goods [was a] valid charitable purpose

12

that advance[ed] [taxpayer's] religious mission." 28 N.J. Tax at 323. Because the "court conclude[d] that the [Subject Property] was reasonably necessary for the [taxpayer's] religious purpose[,] . . . the actual use requirement of the use test [was satisfied]." Ibid. While Borough of Hamburg dealt with the religious exemption found in N.J.S.A. 54:4-3.6, the analysis is on point in that the court explained that it "need not address the issue" of a minimum threshold of use. Id. at 320 n.5.

Here, LWJ submitted uncontested evidence and testimony showing that the Subject Property is actually used in furtherance of LWJ's charitable mission. Specifically, LWJ uses the Subject Property to facilitate a sense of community and opportunities for personal and professional growth for its clients. Clients maintain gardens on the Subject Property, they exercise in the basement, cook meals in the kitchen, complete puzzles in the dining room, have drum circles in the living room, and engage in social events to promote communication and social development.

The court finds the Township's argument that, because the Kolb's are a nuclear family and because they live at the Subject Property full-time, they are ineligible for an exemption under the statute, is without consequence. In making this argument, the Township fails to consider both the obviated exclusivity requirement in the use test, and the fact that courts have refused to impose a quantum of use or specific amount of necessary use. Based upon Ms. Kolb's uncontested testimony, the court is satisfied that the Subject Property is actually being used in furtherance of LWJ's charitable purpose, and that such use is reasonably necessary.

2. **The Profit Test**

While the Township did not give the profit prong any great attention, Ms. Kolb's testimony prompted the court to undertake this inquiry. To that end, the court finds that LWJ satisfies the profit prong of the Paper Mill test in light of the narrow *de minimis* exception. N.J.S.A. 54:4-3.6

13

does not require a nonprofit to operate at a loss, but the nonprofit's "operation and use of its property must not be conducted for profit." Paper Mill, 95 N.J. at 506, 522.

The presence of profit alone, however, does not bar the exemption. Id. at 522. In Paper Mill, the court noted that while the property was used to make money through ticket sales, because the theater's purpose was not to make a profit but rather to increase access to the arts, the court found that the theater satisfied the profit test. Id. at 521. The court explained that to find "Paper Mill at times realiz[ed] a profit and generat[ed] a surplus, [and thus failed the profit test would] render[] [the test] meaningless . . ." Id. at 520. The court opined that "[n]o commercial enterprise, whose essential purpose is to make money, would follow Paper Mill's Policies." Id. at 514.

While the DDD program requires that certain individuals and professionals, who are paid through *public funding* through the DDD program, presumably for profit, accompany LWJ clients for specific purposes on the Subject Property, there has been no suggestion that any money from the DDD program has ever found its way into LWJ's pockets, and therefore, LWJ is not earning a profit from the DDD program.

> The Supports Program and Community Care Program were developed by the New Jersey Department of Human Services' Division of Developmental Disabilities (DDD), which provides *public funding* for certain services that assist eligible New Jersey adults with intellectual and developmental disabilities, age 21 and older, to live as independently as possible.
>
> [N.J. Div. of Developmental Disabilities, https://www.state.nj.us/humanservices/ddd/assets/documents/quick -guide-for-families-english.pdf (last visted Mar. 9, 2022).]

In Paper Mill, the taxpayer was earning the contested profit by selling tickets. Conversely, in the present matter, aides and trainers that accompany clients on the Subject Property are paid with public funds through LWJ's clients' individual DDD programs. While these individuals are

presumably working for profit, there is no financial gain for LWJ as a facilitator of these DDD programs.

"When courts are called on to interpret tax exemption statutes . . . [t]he paramount goal is to discern and implement legislative intent." Gourmet Dining, LLC v. Union Twp., 243 N.J. 1, 16 (2020). There is no dispute here that LWJ adhered to the state-designed and implemented DDD program. LWJ became DDD certified in 2018, LWJ's clients received funding and grants through the DDD program, and the clients' aides and activities are paid for through the DDD program. The program requires that the individual meet with a Support Coordinator to create an Individualized Service Plan (ISP). The ISP directs and authorizes all DDD services and service providers. It is through the ISP that individual aides are approved to assist clients and be covered by the individual's DDD budget. In this way, LWJ is able to offer paid classes to their clients through DDD without exchanging or collecting money. Finding that LWJ fails the profit test because DDD funded aides are making a profit on the Subject Property would contravene the purpose of the DDD program's "mission . . . to assure the opportunity for individuals with developmental disabilities to receive quality services and supports . . . and exercise their right to make choices." N.J.A.C. 10:40-1.1(a).

AHS is instructive; this court found a hospital failed the profit prong by finding that doctors were "use[ing] the Hospital facility to generate private medical bills to patients. These bills [were] charged directly by the private physicians to the patients, and all the money [went] directly to the physicians." AHS Hosp. Corp., 28 N.J. Tax at 502. Furthermore, the court was "substantially unable to discern where non-profit activity occur[ed], and where for-profit activity occur[ed.]" Ibid. The key to this finding was that "the commingling of effort and activities with for-profit

15

entities was significant, and a substantial benefit was conferred upon for-profit entities as a result." Id. at 513.

New Jersey courts are emphatic in finding that significant profit making activity coupled with an intent to make such a profit is a clear violation of the profit prong. See e.g. Paper Mill, 95 N.J. at 521 (in upholding the exemption, the court noted that the nonprofit was "not conducted for the purpose of making a profit, . . . [a]lthough [taxpayer] produced a net income . . . that fact alone does not mean that it is conducted for profit"); Princeton Univ. Press, 35 N.J. at 216 (in denying taxpayer's exemption, the court emphasized that the activity "is undertaken for the purpose of making a profit"); Kimberly Sch. v. Montclair, 2 N.J. 28, 37 (1949) (explaining that the true test of profit prong compliance for a school was "whether charges [were] fixed with the obvious intention of yielding a profit"). Furthermore, *de minimis* profit making activity, or activity that is "an occasional or incidental nonexempt activity, or a regular nonexempt activity which is of an inconsequential . . . character will not preclude an organization from obtaining tax exemption[.]" Greenwood Cemetery Ass'n of Millville, Inc. v. City of Millville, 1 N.J. Tax 408, 414 (Tax 1980). In Greenwood Cemetery, the court found the taxpayer's use of the subject property was not *de minimis* because "there was considerable business activity resulting in profit to a private individual." Ibid.

The present facts are substantially different from those in AHS. Here, any profit that may flow to the aides from their access to and presence upon the Subjecct Property is *de minimis*. Unlike the for-profit doctors in AHS, there is no significant entanglement between the aides and the Subject Property, and LWJ derives no benefit from the activities of the aides there.

In AHS, for-profit doctors had lucrative contracts with the Hospital. Those contracts often provided the for-profit doctors with organizational and administrative rights to the operations of

16

their medical disciplines within the Hospital itself.  Furthermore, for-profit doctors had substantial entanglement with alleged nonprofit aspects of the Hospital, unlimited access to Hospital property, whose presence there was clearly intended to make a profit.  In sharp contrast, the aides operating at LWJ are paid with public funds through the New Jersey Department of Health's DDD program.  The only connection the aides have with the Subject Property is to fulfill their duties to their clients through the government-funded DDD program.

The profit making activity in Greenwood is also clearly distinguishable from the present facts.  Greenwood Cemetery Ass'n, 1 N.J. Tax at 414.  There, the court reasoned that "a private, profit-making business was carried on by a third party [at the subject property] . . . for the personal benefit of [taxpayer's wife.]"  Id. at 412.  "It is not the legislative purpose of the [exemption statute] to exempt property used for private personal gain from local property taxes."  Ibid.  The president of a cemetery association lived on the grounds of the cemetery with his family because the "caretaker's on-site residence is necessary for the operation and maintenance of the cemetery."  Id. at 410.  However, his wife was "engaged in the business of selling bronze memorial plaques.  [The profit of which] inured to the benefit of the president's wife[.]"  Id. at 411.  The wife engaged in "collection of bills, the completion of orders, the keeping of books of account, the keeping of a checkbook, the keeping of the order forms and . . . winding down [the business]."  Ibid.  Such "considerable business activity" rendered the *de minimis* exception inapplicable.  Id. at 414.

Here, the aides' activity is limited by their ISP and client budgets, it cannot be said to be considerable; there is no indication that a substantial profit is being made,[9] and more importantly,

_____

[9] Pursuant to the DDD Community Care Program Policies & Procedures Manual, section 8.3.2.2 Wages and Benefits, https://www.nj.gov/humanservices/ddd/documents/community-care-program-policy-manual.pdf (last visited Mar. 23, 2022), the clients' support coordinators ensure the aides' hourly wages fall within a 'reasonable and customary' range and can be supported in the client's budget.

17

there is no evidence that LWJ or anyone using the Subject Property is motivated to make a substantial profit. The aides themselves are reasonably necessary for the safety of the clients, and to the success and efficiency of the DDD program.

For the foregoing reasons, this court finds that LWJ satisfies Paper Mill's profit prong because of the *de minimis* nature of the activity and the blatant lack of profit making intent.

### 3. 2019 Appeal

This court finds that LWJ should have been aware of the filing deadline for the 2019 appeal, and therefore its untimeliness is inexcusable. At trial, the Township submitted LWJ's statement of organization claiming property tax exemption, which the Township received on October 31, 2018. The Township's January 9, 2019 letter explicitly informed LWJ that their request for exemption was denied, and they had the right to appeal. LWJ may or may not have timely received the tax bill, but the Legislature's intent was not to require actual receipt of the tax bill but rather notice. If the Legislature wanted to require receipt rather than notice, they could have required the tax bill to be sent with return receipts. See Green v. East Orange, 21 N.J. Tax 324, 334 (Tax 2004) (explaining the difference between certified mail and return receipt and how the absence of return receipt signals notice as the Legislature's true requirement). LWJ cannot deny actual knowledge under the present facts given that it received the Township's January 2019 letter advising of the exemption application's denial and the right to appeal by April 1, 2019. Because it was untimely filed, the court does not have jurisdiction to hear the 2019 appeal, and thus the matter is dismissed for lack of jurisdiction.

### 4. Ms. Kolb's Credibility

The court must weigh the credibility of witnesses. Trial courts are in a unique position to judge credibility because such findings are "substantially influenced by [their] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). "Deference to a trial court's fact-findings is especially appropriate when the evidence is largely testimonial and involves questions of credibilitiy." *In re* Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997).

Here, Ms. Kolb was the only witness, and the Township, notably, did not dispute the majority of Ms. Kolb's testimony. Ms. Kolb ably and adequately testified to LWJ's purpose and its use of the Subject Property. Despite some minor inconsistencies,[10] the court did not find anything in her testimony that would tarnish her credibility. There was no evidence of impermissible leading questions or instances of selective memory as seen in AHS Hosp. Corp., 28 N.J. Tax at 470. Furthermore, Ms. Kolb's testimony was not substantially inconsistent and self-serving with the intent to mislead the court, like that found in Hertz v. Borough of Lincoln Park, 31 N.J. Tax 1, 17 (Tax 2019). Rather, Ms. Kolb's testimony was "forthcoming" with specific details and included helpful "factual back-up information." See AHS Hosp. Corp., 28 N.J. Tax at 470.

Ms. Kolb spoke confidentially and passionately on all that LWJ does at the Subject Property, from managing the gardens to preparing and eating meals, solving puzzles, recording

---

[10] Ms. Kolb did testify as being confused about the zoning issue. She claimed that LWJ never went to a municipal body to clarify the zoning issue after 2018, but later explained that LWJ appeared in front of the County Board in response to the Township's 2018 letter. The court is satisfied that any inconsistencies in this regard are *de minimis* in nature.

podcasts, learning life skills, and practicing responsibility. She also testified as to how the DDD payments work and how LWJ received their DDD certification.

This court also considers the lack of blatant coaching or nefarious leading of the witness at trial. In light of the relevant testimony's uncontested nature, this court finds Ms. Kolb's testimony to be credible and sufficient to meet her burden establishing that the Subject Property was in fact actually used in furtherance of LWJ's charitable purpose.

### 5. Zoning

Under prevailing law, the court is compelled to reject the Township's contention that the Subject Property is barred from exemption because it may be in violation of local zoning ordinances.[11] When "the taxpayer complies with the requirements of [N.J.S.A. 54:4-3.6], it is entitled to the exemption from real property taxes even if the use of the property does not comply with the municipal zoning ordinance." Soc'y of the Holy Child Jesus, 418 N.J. Super. at 368. N.J.S.A. 54:4-3.6 does not require compliance with municipal land use law, so it is not up to the courts to deny exemptions based on zoning noncompliance. Ibid.

While this court is compelled to follow the reasoning of Soc'y of the Holy Child Jesus set forth by the Appellate Division on this issue,[12] the following commentary is most respectfully offered: "When reviewing two separate enactments, the [c]ourt has an affirmative duty to reconcile

---

[11] N.J.S.A. 40:55D-66.1 establishes that "[c]ommunity residences for persons with developmental disabilities . . . shall be a permitted use in all residential distircts of a municipality, and the requirements therefor shall be the same as for single family dwelling units." However, it is not within the jurisdiction of this court to determine whether the current use of the Subject Property by LWJ constitutes a "community residence" within the meaning of said statute.

[12] See Tomaino v. Burman, 364 N.J. Super 224, 233 (App. Div. 2003) ("Although trial judges are privileged to disagree with our decisions, 'the privilege does not extend to non-compliance.' . . . As such, the trial court has no discretion when a mandate issues from an appellate court. It simply must comply.") (citing Reinauer Realty Corp. v. Paramus, 34 N.J. 406, 415 (1961)).

20

them, so as to give effect to both expressions of the lawmakers' will . . . it is [a court's] obligation to make every effort to harmonize separate statutes." St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14 (2005) (citing In re Adoption of a Child by W.P. and M.P., 163 N.J. 158, 182-83 (2000) (Poritz, C.J., dissenting)).

To interpret N.J.S.A 54:4-3.6 as if it has no bearing on a zoning statute strips the zoning statute of meaning, rendering the overlooked statute superfluous. "A construction that will render any part of a statute inoperative, superfluous or meaningless, is to be avoided." Hoffman v. Hook, 8 N.J. 397, 406 (1952). Enforcing a zoning statute while interpreting an exemption statute is not "engraft[ing] upon the unambigious language of the [s]tatute the requirement that [the Subject Property] comply with [the municipal] zoning ordinance[,]" Soc'y of the Holy Child Jesus, 418 N.J. Super. at 387, but rather reading the two controlling statutes in tandem. While N.J.S.A. 54:4-3.6 does not require a taxpayer to legally use their property, the controlling zoning statute does. In this court's view, granting an exemption under N.J.S.A. 54:4-3.6 to a property violating a municipal zoning statute falls short of a court's obligation to read statutes in harmony with one another.

Furthermore, allowing a taxpayer to enjoy the benefits of a tax exemption, while it violates zoning laws, is patently inconsistent with the level of scrutiny required to meet the statutory and court enumerated criteria for tax exemption applications. See Feddrs Fin. Corp. v. Div. of Taxation, 96 N.J. 376, 386 (1984) (Tax "exemptions are to be construed narrowly.")

The court recognizes that the Township is not without recourse. It can impose fines, and take legal action to shut down illegal zoning operations until the violators apply for and receive zoning approval. Such action has not happened under the present facts. Shutting down illegal use that supported the granting of an exemption, would likely, *arguendo*, lead to the loss of the

21

exemption. That process, however, can be tenuous and take considerable time. It seems to this court that the more practical solution is to require zoning compliance as part of the exemption application process. To that end, this court is in accord with our colleagues in the upper courts: it is within the purview of the Legislature, and not the courts, to reconcile the exemption statute (N.J.S.A. 54:4-3.6) with Municipal Land Use Law (N.J.S.A. 40:55D-1-163). See Christian Mission John 3:16 v. Passaic City, 243 N.J. 175, 192 (2020) (interpreting Soc'y of the Holy Child Jesus, to hold that "a violation of zoning and construction ordinances is not enough to deny a tax exemption *without legislative authorization*") (emphasis added). It is not within the jurisdiction of this court to effectuate a change in the law in this regard. McMahon v. City of Newark, 195 N.J. 526, 546 (2008) ("The Tax Court is vested with limited jurisdiction [as outlined in] N.J.S.A 2B:13-2[.]"); see also Jablonowska v. Suther, 195 N.J. 91, 105 (2008) ("[C]ourts ought not 'rewrite a plainly-written enactment of the Legislature[.]'") (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)).

### 6. Public Policy

"[O]ne justification for granting a charitable tax exemption is that if the charitable work were not done by a private party, it would have to be done at public expense." Advanced Housing, Inc. v. Twp. of Teaneck, 215 N.J. 549, 568 (2013). Additionally, if "the charitable work done by the private entity will spare the government an expense that ultimately it must bear[,]" the tax exemption operates as a *quid pro quo*. Id. at 572 (citations omitted). "[T]he receipt of government subsidies or funds is not contraindicative of a charitable purpose." Id. at 573 (citing Southern Jersey Family Med. Ctrs., Inc. v. City of Pleasantville, 351 N.J. Super. 262, 266, 273-75 (App. Div. 2002) (finding that receipt of substantial government grants and "virtually no voluntary charitable contributions" does not negate charitable purpose), aff'd o.b., 176 N.J. 184 (2003)).

22

In Advanced Housing, this state's Supreme Court examined a similar situation in which a nonprofit corporation ran housing for individuals with developmental disabilities. 215 N.J. at 553. Among other things, the municipalities challenged the organization's exemption, claiming that the charitable effects of the organization were secondary to its primary purpose, providing housing and thus the exemption must be denied. Id. at 563. In granting the exemption, the court emphasized the housing crisis for individuals with developmental disabilities. Id. at 522. Citing a 2005 Task Force on Mental Health commissioned by Acting Governor Codey, the court explained that there is a "dearth of affordable housing that offer[s] comprehensive support services." Ibid.

The court went on to say that the taxpayer's charitable operation of providing housing to "mentally disabled citizens, who otherwise would be dependent on government relief, is in furtherance of this State's express policy." Id. at 554. While noting that the organization receiving money from federal and state agencies "is supportive of its charitable purpose[,]" the court explained that the organization "reasonably posits" that denying the exemption would hinder the organization's ability to continue in its charitable purpose. Id. at 575. In granting the exemption, the court noted that denying the organization the exemption "runs directly contrary to our State's public policy." Ibid.

The same would be true under the present facts. LWJ's charitable status is uncontested. This court is satisfied that LWJ actually uses the Subject Property to help individuals with developmental disabilities have lives filled with learning and joy in accordance with N.J.S.A. 54:4-3.6. Furthermore, to find that LWJ violates the profit prong of the Paper Mill test by allowing individuals using the Subject Property to be paid pursuant to various state-sanctioned programs would contravene reason. LWJ's purpose and existence is evidenced by their federal and state

23

nonprofit certifications, their DDD certification, and every other certification LWJ has obtained to further its objectives.

The court also observes:

> The stigmatization of mental illness is still an important societal problem. The general population is largely ignorant about this problem, and fear of the mentally ill remains prevalent. Although we no longer imprison, burn or kill the mentally ill as in the Middle Ages or in Nazi Germany, our social standards and attitudes are nonetheless unworthy of modern welfare states. Structural discrimination of the mentally ill is still pervasive, whether in legislation or in rehabilitation efforts.
>
> [Wulf Rössler, The Stigma of Mental Disorders: A Millennia-Long History of Social Exclusion and Prejudices, EMBO Rep., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5007563/ (last visited Feb. 11, 2022).]

Regrettably, "[t]he stigma of mental illness is universal. . . . 'there is no country, society or culture where people with mental illness have the same societal value as people without mental illness.'" American Psychiatric Association, Stigma, Prejudice and Discrimination Against People with Mental Illness, https://www.psychiatry.org/patients-families/stigma-and-discrimination (last visted Feb. 11, 2022) (citations omitted).

Without the Kolbs' innovative approach for the care of their developmentally disabled son, and others like him, the costs of his care would fall upon society. Also, present government, already strained in its resources for the mentally ill, would bear the obligation to see to his well being at a cost likely to be significantly higher than the public funding allotted for DDD programs. See Advanced Housing, Inc., 215 N.J. at 559 (explaining that in 2005, it cost the state $146,000 a year to care for an individual in a state psychiatric hospital).

**CONCLUSION**

Because LWJ met its burden by satisfying the elements of N.J.S.A. 54:4-3.6 as enumerated by <u>Paper Mill</u>, LWJ's appeals for 2017 and 2020 are GRANTED, the Township's 2016 and 2018 appeals are DENIED, and LWJ's 2019 appeal is DISMISSED for lack of jurisdiction. The Tax Court's judgment consistent with this opinion will be uploaded to *eCourts*.