NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

```
-------------------------------------------------x
GALLOWAY EDUCATION, LLC,            :
                                    :   TAX COURT OF NEW JERSEY
            Plaintiff,              :   DOCKET NO: 005841-2020
                                    :              011744-2021
            v.                      :
                                    :
TOWNSHIP OF GALLOWAY,               :
                                    :
            Defendant.              :
                                    :
-------------------------------------------------x
```

Decided:  June 24, 2022.

Michael E. Sullivan for plaintiff (Parker McCay P.A., attorneys; Michael J. Coskey and Matthew S. Oorbeck, on the brief).

Thomas G. Smith for defendant (Law Offices of Thomas G. Smith, attorney).

CIMINO, J.T.C.

**INTRODUCTION.**

Plaintiff, taxpayer Galloway Education, LLC (taxpayer) is the named landlord of a property leased to the Atlantic Community Charter School, Inc. (ACCS). Taxpayer now seeks exemption from property taxes as a not-for-profit entity. However, the for-profit representative of the various bondholders which financed the purchase of the property has the essential powers of a landlord by virtue of the

terms of the lease and other governing documents. With the bondholder representative as the de facto landlord, the motion for summary judgment as to the exemption is denied.

**STATEMENT OF FACTS.**

The Atlantic Community Charter School, Inc. (ACCS), a New Jersey not-for-profit corporation, has been issued a charter by the New Jersey Department of Education since 2014 to operate a charter school pursuant to the Charter School Program Act of 1995. See N.J.S.A. 18A:36A-1 to -18. Under the Act, a school receives payment from the sending districts it serves, in this case, the City of Atlantic City, City of Absecon, Township of Egg Harbor, Township of Galloway, and the City of Pleasantville. This payment consists of a per pupil amount as determined by a formula that takes into account the cost to educate students from the sending districts. N.J.S.A. 18A:36A-12. ACCS receives approximately $16,000 per student enrolled. To operate the school, ACCS has a contract with CSMI, LLC, a Pennsylvania limited liability company.

When the school initially opened in September of 2014, it was located in Atlantic City. The facilities consisted of mobile trailers used as temporary classrooms which limited the number of students that could be enrolled. At the start of the 2016 to 2017 academic year, ACCS moved to the property in Galloway

Township which is the subject of this appeal. The property was formerly used by another charter school. ACCS did not own the land, but rather leased the facility.

With expanding enrollment, ACCS sought to expand the school facilities. Comprehensive Recovery Services, Inc., a nonprofit corporation of the State of Colorado, established Galloway Education, LLC, a Delaware limited liability company. The limited liability company agreement of Galloway Education, LLC, indicates that it is a "[company] organized and operated exclusively for religious, educational, benevolent, fraternal, charitable, and reformatory purposes and not for pecuniary profit." The sole member which has all the interest in Galloway Education is Comprehensive Recovery Services.

To fund the expansion project, bonds which totaled $11,165,000 were sold by Galloway Education to investors of Hamlin Capital Management, LLC, a for-profit investment firm located in New York. Hamlin is designated the Bondholder Representative so long as the majority of the outstanding bonds are owned by persons for whom Hamlin serves as an investment advisor. The proceeds of the bonds were utilized by Galloway Education to purchase the land and construct an addition to the school. Wilmington Trust is designated as the trustee and handled the disbursements during construction as well as collecting the payments on the bond and forwarding those payments to the bondholders.

There is a lease agreement between Galloway Education and ACCS. A review of the lease reveals that the Bondholder Representative is mentioned some 120 times. However, a closer review of the lease agreement reveals that the Bondholder Representative exercises significant control as would a landlord. Upon default of ACCS, the Bondholder Representative may "elect to terminate this Lease . . ." Lease Agreement between Galloway Education and ACCS (Lease) ¶ 29(B)(iii) (Feb. 21, 2019). Also, "[t]he Bondholder Representative may sue for and collect Rent, Additional Rent and any other charges due hereunder . . ." Lease ¶ 29(B) (last paragraph prior to ¶ 29(C)). And, the "Bondholder Representative may enter and expel [ACCS] . . . and remove the effects . . . (using such force for such purposes as may be lawful and necessary) without being liable for prosecution . . ." Lease ¶ 29(B)(iv). The "Bondholder Representative, acting for the Landlord, may, without any further demand or notice to [ACCS], . . .enter the Property and market the Property for sale . . ." Lease ¶ 29(B) (at end after (xi)). In addition, the Bondholder representative may "employ a consultant, at [ACCS'] expense, to make recommendations with respect to the operations of [ACCS], which recommendations [ACCS] is obligated to follow." Ibid.

Even outside default, the Bondholder Representative has significant control over the property. The Bondholder Representative must consent to any change in use of the property. Lease ¶ 8(A). ACCS "shall not assign this Lease or sublet the

-4-

Leased Property in whole or in part without the consent of . . . the Bondholder Representative." Lease ¶ 9(A). "Any and all trade fixtures appliances, furniture and other moveable furnishings and equipment constituting personal property in the School Facility which are or have been paid for or financed by Landlord (. . .) . . . may not be removed from the School Facility by [ACCS] at any time . . . without the prior written consent of . . . the Bondholder Representative, unless contemporaneously replaced with similar property of comparable or better quality." Lease ¶ 11. Moreover, [ACCS] has indemnified the Bondholder Representative as to any environmental claims. Lease ¶ 13(E). Except for minor work, modifications and additions cannot be made to the property without the consent of the Bondholder Representative. Lease ¶ 20(A). Repairs of any damages require the Bondholder Representative's consent as well. Lease ¶ 15(A).

Any change in the lease is required to have the written consent of the Bondholder Representative. Lease ¶ 35. This is evidenced by the amendments to the lease which reveal a sign-off from the Bondholder Representative. See First Amendment to Lease Agreement (Mar. 1, 2019) and Second Amendment to Lease Agreement (June 1, 2020). In the event that ACCS violates any easements, development agreements, and such, that govern and regulate the development of the leased property, ACCS agrees to indemnify the Bondholder Representative of any

-5-

failure to comply. Lease ¶ 22(D). The Bondholder Representative can also dictate certain insurance requirements of ACCS. Lease ¶ 16(A).

The Bondholder Representative is also empowered to inspect the property. Lease ¶ 30. "If [ACCS] has not exercised the applicable option to extend this Lease, . . . the Bondholder Representative . . . shall thereafter have the right to enter the Leased Property at all reasonable times for the purpose of exhibiting the Leased Property to others . . . ." Lease ¶ 32(A). In addition, if the lease is not renewed, the Bondholder Representative, can place "for sale" and "for rent" signs on the property. Ibid.

The Bondholder Representative also has a say over the operations of the school. ACCS is required to employ CSMI as manager unless another manager is approved by the Bondholder Representative. Lease ¶ 2(A) (definition of "manager"). The borrowing of ACCS is limited without consent of the Bondholder Representative. Lease ¶ 11. The organizational structure of ACCS cannot change without approval of the Bondholder Representative. Lease ¶ 28(S). ACCS is to "deliver to . . . the Bondholder Representative . . . audited financial statements of income, retained earnings and cash flows . . . ." Lease ¶ 38(A). In addition, "the Bondholder Representative . . . shall have the right . . . to audit, examine, and make excerpts or transcripts of or from the records of [ACCS]." Lease ¶ 38(C).

The "annual fixed rent" specified in the lease coincides with the bond debt servicing amounts. Compare Lease Exhibit C with Limited Offering Memorandum 5 (Feb. 20, 2019). In fact, Exhibit C of the unamended Lease breaks out the principal and interest portions of the "annual fixed rent." Lease Exhibit C. "Annual Fixed Rent . . . shall be paid . . . by . . . [ACCS] directly to the Trustee, as the assignee of the Landlord, for deposit in accordance with the Indenture." Lease ¶ 6(K). See also Indenture of Trust § 7.01(a) (Feb. 1, 2019). The Trustee would then remit payment to the bondholders. Indenture of Trust § 3.02(b). ACCS also remits an "administrative fee" of $62,500 directly to Galloway Education each year as additional rent. Lease ¶6(J) ($62,500 fee), 6(K) (directly to Galloway Education).

As set forth in the organizational document for Galloway Education, Comprehensive Recovery Services has the ability to transfer or assign its interest in Galloway Education. Limited Liability Company Agreement of Galloway Education §14 (Nov. 19, 2018). To secure the sale of bonds utilized for the project, the Bondholder Representative required that Comprehensive Recovery Services pledge its interest in Galloway Education. Pledge Agreement Introduction (Feb. 1, 2019). In the event of a default, the Bondholder Representative has the right to exercise all voting rights Comprehensive Recovery Solutions has as to Galloway Education. Pledge Agreement Article VI (last paragraph). In other words, a for-profit entity, the Bondholder Representative, would be in effective control of the

not-for-profit Galloway Education. Also, upon default, the Bondholder Representative can direct the Trustee to name a successor sole member of Galloway Education. Pledge Agreement § 7.2(e).

This matter comes before the court on motion for summary judgment. On summary judgment, the court must assess "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

**LEGAL CONCLUSIONS.**

As explained by our Supreme Court on a number of occasions:

> The fundamental approach of our tax statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation. Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption.
>
> [Int'l Schs. Servs. v. Township of West Windsor, 207 N.J. 3, 15 (2011) (citing Princeton Univ. Press v. Borough of Princeton, 35 N.J. 209, 214 (1961).]

Many of the exemptions for property not owned by a governmental entity are addressed in N.J.S.A. 54:4-3.6. Exemption to property taxes were first codified in 1851. L. 1851, p. 272, § 5. The modern form of the statute first appeared in 1918 and was codified into the present form in 1937. L. 1918, c. 236, § 202; R.S. 54:4-

3.6 (1937). Since first appearing over one hundred fifty years ago, there have been numerous amendments. The first sentence of the statute is now 859 words and contains a myriad of exemptions.

One of the exemptions is "for all buildings actually used for colleges, schools, academies or seminaries . . ." N.J.S.A. 54:4-3.6. However, the statute has a second sentence which requires that an exemption provided for in the first sentence "appl[ies] only where the association, corporation or institution claiming the exemption owns the property in question . . . and authorized to carry out the purposes on account of which the exemption is claimed . . ." Ibid. [1]

Galloway Education is not authorized to operate a school. The limited offering memorandum issued by Galloway Education confirms that "Galloway [Education] is a single purpose entity and is not a school." Rather, ACCS is the holder of the State charter to operate a school. There must be a confluence of ownership and use for an exemption to be applicable. Mega Care, Inc. v. Township of Union, 15 N.J. Tax 566, 573 (Tax 1996), aff'd. o.b., 22 N.J. Tax 604 (App. Div. 2004). Since Galloway Education and not ACCS is the owner of the property, the

---

[1] The statute also provided that the association, corporation or institution is incorporated or organized under the laws of this State. However, that provision was found to be unconstitutional. WHYY, Inc. v. Glassboro, 393 U.S. 117 (1968) (rev'g 50 N.J. 6 (1967)) .

school exemption does not apply. Correctly recognizing this provision, Galloway Education has not sought the exemption under the school provision.

Rather, Galloway Education seeks the exemption under a 1931 amendment exempting properties utilized for the moral and mental improvement of men, women and children that are owned by a holding company. This exemption applies to:

> . . . all buildings owned or held by an association or corporation created for the purpose of holding the title to such buildings as are actually and exclusively used in the work of two or more associations or corporations organized exclusively for the moral and mental improvement of men, women and children . . .
>
> [N.J.S.A. 54:4-3.6. See also L. 1931, c. 372.]

There is also another similar provision enacted in 1949 dealing with a not-for-profit entity leasing property to a religious or charitable entity which provides:

> . . . all buildings owned by a corporation created under or otherwise subject to the provisions of Title 15 of the Revised Statutes or Title 15A of the New Jersey Statutes and actually and exclusively used in the work of one or more associations or corporations organized exclusively for charitable or religious purposes, which associations or corporations may or may not pay rent for the use of the premises or the portions of the premises used by them . . .
>
> [N.J.S.A. 54:4-3.6. See also L. 1949, c. 85.]

In evaluating the exemptions provided by N.J.S.A. 54:4-3.6, the courts have applied a 3-part test to determine eligibility for a local property tax exemption. This 3-part test requires that the owner of the property must show that (1) it is organized

exclusively for the tax-exempt purpose; (2) its property must actually be used for the tax-exempt purpose; and (3) its operation and use of the property must not be conducted for profit. Int'l Schs. Servs., 207 N.J at 16 (citing Paper Mill Playhouse v. Township of Millburn, 95 N.J. 503, 506 (1984)); Advance Housing, Inc. v. Township of Teaneck, 215 N.J. 549, 567-68 (2013) (citing Paper Mill Playhouse, 95 N.J. at 506.) The three prongs of the test are commonly referred to the "organization," "use," and "profit" prongs. Borough of Hamburg v. Trustees of Presbytery of Newton, 28 N.J. Tax 311, 318 (Tax 2015).

The burden rests on the claimant to prove entitlement to a local property tax exemption. N.J. Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 178 (1996); Advance Housing, 215 N.J. at 566; Int'l Schs. Servs., 207 N.J. at 15. Exemptions from taxation are to be strictly construed against those invoking the exemption. Advance Housing, 215 N.J. at 566; Int'l Schs. Servs., 207 N.J. at 15. N.J. Carpenters, 147 N.J. at 177. These principles foster the "well-established policy that 'the public tax burden is to be borne fairly and equitably.'" Advance Housing, 215 N.J. at 566; (quoting Int'l Schs. Servs., 207 N.J. at 15).

In applying the statutory dictates of N.J.S.A. 54:4-3.6, the common thread which runs through the controlling case law is not to elevate form over substance. To this end, the Supreme Court has repeatedly stated that a fact specific analysis is required. Presbyterian Homes of Synod of N.J. v. Division of Tax Appeals, 55 N.J.

275, 286 (1970); Advance Housing, 215 N.J. at 572; Int'l Schs. Servs., 207 N.J. at 22. Coupled with this requirement of a fact specific analysis is the application of common sense. Int'l Schs. Servs., 207 N.J. at 20; Paper Mill Playhouse, 95 N.J. at 521. The required common-sense fact-based approach requires more than merely looking at the books of the organization and tallying up its profit and loss. Int'l Schs. Servs., 207 N.J. at 20; Paper Mill Playhouse, 95 N.J. at 521.

Whether holding property used for a school meets the use prong per 1) the 1931 amendment pertaining to holding property for the moral and mental improvement of men, women and children, or 2) the 1949 amendment pertaining to a not-for-profit leasing property to a charitable purpose, turns out to be an examination which may not be as straightforward as it seems. However, the court need not decide this exact issue since the organizational and profit prongs are not met.

Since the prongs are interrelated, it is helpful at times to review the prongs in tandem. See Int'l Schs. Servs., 207 N.J. at 17 (since prongs are interwoven, Court evaluated use and profit prongs in tandem). Here, the court will examine the organization and profit prongs in tandem.

Merely creating a non-profit does not automatically satisfy the organizational prong. Decisions span back over 100 years in which the subterfuge of a "corporate dress" was found insufficient to confer non-profit status. Town of Montclair v. State

-12-

Bd. of Equalization of Taxes, 86 N.J.L. 497, 497-98 (Sup. Ct. 1914), aff'd, 88 N.J.L. 374 (E. & A. 1915); see also Carteret Acad. v. State Bd. of Taxes & Assessment, 102 N.J.L. 525, 529 (Sup. Ct. 1926), aff'd, 104 N.J.L. 165 (E. & A. 1927). In other words, a practical approach in necessary. For example, back in the 1910s, our courts held that changing the status of school from a for-profit corporation to a not-for-profit corporation was not enough to confer the local property tax exemption. Town of Montclair, 86 N.J.L. at 497-98. See also Cateret Acad., 102 N.J.L. at 529 (similar facts from the 1920s). Later in the 1980s, this court held that reorganizing a family medical practice from profit making partnership to a non-profit was found insufficient to confer the exemption. Township of Weymouth v. Mem'l Park Fam. Prac. Ctr., Inc., 7 N.J. Tax 589, 595-96, 605 (Tax 1985).

Just as having the proper corporate documents does not guarantee an exemption, solely relying upon the corporate documents for disqualification has been rejected by the Appellate Division. Int'l Schs. Servs., Inc. v. Township of West Windsor, 381 N.J. Super. 383, 385 (App. Div. 2005). Specifically, the Appellate Division indicated that "courts are not barred from considering extrinsic information if relevant to ascertaining the meaning of the corporate documents." Ibid. With that said, the lease agreement and the pledge agreement are key documents to understanding the financial arrangement in this case. Evaluating how these

organizational documents impact the profit of the for-profit bondholders is key to discerning whether an exemption is appropriate under the law.

As to the profit prong, Galloway Education is nominally established as a non-profit and is the owner of the property. Galloway Education has entered into a lease with ACCS, which at first glance is not much different than any lease which a commercial landlord would enter into with a tenant. However, a review of the lease reveals that it is not Galloway Education that is calling the shots in this arrangement. Rather, it is the Bondholder Representative that has been granted extensive powers under the lease. In addition, there is a separate pledge agreement which empowers the Bondholder Representative to take over the membership and ownership of Galloway Education. Overall, the activities and existence of Galloway Education are at the mercy of the for-profit Bondholder Representative.

As to the lease, the Bondholder Representative is mentioned over 120 times throughout the document. A review of the Lease plainly reveals that the Bondholder Representative is the de facto landlord in this matter. The Bondholder Representative is not merely a passive investor cutting and cashing the bond coupons.[2] The Bondholder Representative can upon default of ACCS, cancel the

---

[2] Back in the day, bonds came printed with coupons printed on them. To receive an interest payment, the bondholder would clip off a coupon when it came due and redeem it for cash. Ken Belson, Coupon Clipping, the Old-Fashioned Way, N.Y. Times, Feb. 12, 2006, at B5.

lease, enter and expel ACCS and sue for the rents. Certainly, these are powers of a landlord.

The powers of the Bondholder Representative are vast and extend to not only default, but also the day-to-day operation of the property such as ACCS' use of the property, subletting, removal of furniture by ACCS, environmental issues, repairs and modification to the premises by ACCS and ACCS' insurance coverage. The Bondholder Representative also has access to the property for inspection and marketing and sale and can place a for-sale sign on the property.

The reach of the Bondholder Representative extends beyond operation of the physical plant, to how ACCS conducts the business of operating a school. For example, the Bondholder Representative must approve the management company that operates the school on behalf of ACCS, has set limits on the amounts which ACCS can borrow, and restricts ACCS from changing its organizational structure. The Bondholder Representative has the right to financial statements of ACCS as well as the right to conduct an audit of ACCS.

The court recognizes that private investors loaning money to a not-for-profit are not required to forgo their profit. However, this situation is not where investors are merely holding a mortgage on lands owned by a school. Here the school is a mere tenant of the property under a lease and pledge agreement in which the Bondholder Representative has extensive control. The taxpayer selects the form of

-15-

business operation, and the taxpayer has to deal with the consequences of its selection. General Trading Co. v. Dir., Div. of Tax'n, 83 N.J. 122, 136 (1980).

If the school defaults on its lease, it cannot effectively look to Galloway Education for relief or some sort of work-out. Certainly, Galloway Education, as a non-profit, should not be worried about profit, but rather fostering good works, albeit indirectly, by enabling this school project. Even assuming Galloway Education would want to help, it would be powerless since the structure of the deal places the real power of a landlord with the Bondholder Representative. The school is at the mercy of the Bondholder Representative who is primarily interested in the timeliness and thus profitability of the lease payments. At best, Galloway Education functions as a property manager under the control of the Bondholder Representative. Per the lease, the fixed rent payments are paid to the bondholders through the Trustee without even passing through Galloway Education. These payments correlate with the principal and interest due on the bonds. For its services, Galloway Education gets an administrative fee of $62,500 per year from ACCS as additional rent.

"[A]n exemption should not be granted when profit can be traced 'into someone's personal pocket.'" International Schools, 207 N.J. at 24 (quoting Paper Mill Playhouse, 95 N.J. at 522). Here, the powers conferred to the Bondholder Representative ensure the flow of revenues from the school to the bondholders. The court finds this situation is not much different than a for-profit entity directly leasing

-16-

its property to the school. In such a circumstance, it is plain to see that property tax would be due and owing. Likewise, in this case, with the actual powers of a landlord in the hands of the Bondholder Representative ensuring a profit is made, the exemption is denied.

There is a second basis for this court to not allow a property tax exemption. Galloway Education is established under Delaware law as a limited liability company. Comprehensive Recovery Services, a Colorado not-for-profit corporation is the sole member of Galloway Education. As part of the bond financing deal, the Bondholder Representative required that Comprehensive Recovery Services pledge its interest in Galloway Education. In the event of a default, the Bondholder Representative can exercise all voting rights or direct that a successor sole member be named.

With the powers conferred by the pledge agreement, the ownership of Galloway Education is precarious because the Bondholder Representative can seize control of a nominally not-for-profit entity in order to protect the profits of the bondholders. Certainly, the laws of this State do not contemplate that not-for-profit entities are controlled or owned, or subject to be controlled or owned, by for-profit entities. Even if the laws of Delaware or Colorado (where Galloway Education and Comprehensive Recovery Services are organized) contemplate such a result, our laws do not contemplate such control by a for-profit would allow eligibility for a tax

exemption. It is one thing for a lender or a Bondholder Representative to have a mortgage on a property owned by a non-profit, it is quite another thing for a profit-making entity to have the ability to seize and obtain full and unfettered control of the not-for-profit entity for its own purposes.

Our courts have previously dealt with properties used for seemingly not-for-profit activities that do not qualify for an exemption because the properties benefit for-profit enterprises. In New Jersey Carpenters, a training facility was established by contractors and the union to train apprentices. Id., 147 N.J. at 173, 175. While the training facility itself is not established to generate a profit, it was created to primarily benefit a specific for-profit sector of the economy. Id. at 184, 185. As a result, the Supreme Court rejected the exemption. Id. at 189. In addition, in Textile Research Institute v. Township of Princeton, 35 N.J. 218 (1961), a not-for-profit institute also had the objective of benefitting a profit-making segment of society. Id. at 223. As a result, the Court rejected its claim to an exemption. Ibid. These decisions comport with the Supreme Court's repeated instruction to apply a common sense fact-based approach which requires more than merely looking at the books of the organization and tallying up its profit and loss. Int'l Schs. Servs., 207 N.J. at 20; Paper Mill Playhouse, 95 N.J. at 521.

Here, the structure of deal is plainly for the benefit of the bondholders represented by the Bondholder Representative. Control of the nominally not-for-

profit Galloway Education can be transferred at the demand of the Bondholder Representative to a for-profit to protect the profits of the bondholders. The not-for-profit in this case exists to benefit a for-profit endeavor. This provides further basis to deny the exemption.

Finally, there is a third basis to deny the exemption. The distinction between profit-making and not-for-profit activities must be "evident, readily ascertainable, and separately accountable for taxing purposes" and "presumes an ability to identify it, segregate it, and measure it for local taxing purposes." Int'l Schs. Serv., 207 N.J. at 23. "Otherwise, to permit a nonprofit entity to claim a property tax exemption when it has become inseparably entangled with for-profit entities would allow indirect taxpayer subsidization of those entities. In other words, a competitive advantage would be conferred on those for-profit entities at the expense of the taxpaying public." Ibid. There is a "duty [for a not-for-profit] to conduct its affairs in such a fashion as to allow local taxing authorities to readily determine its eligibility for exemption." Id. at 24. Failing this duty leads to a "quagmire of entanglement" which necessitates denial of the exemption. Id. at 24-25.

There is nothing sinister or wrong with the Bondholder Representative ensuring that a profit is made. The court realizes that the avenues for financing would be limited without the potential for a profit. However, a tax exemption here would allow "indirect taxpayer subsidization" of the bondholders. See Id. at 23.

This would confer a competitive advantage upon the bondholders at the expense of the other taxpayers in the municipality.  <u>Ibid.</u>

The layers of entities and lengthy agreements obfuscate that the for-profit entities in this case have essential control over the operation of a seemingly not-for-profit endeavor.  A local tax assessor should not be forced to peel off complex layers of corporate and organizational structure to determine who is really in control, or who really profits.  The taxpayer here has failed to conduct its affairs in such a way for the local assessor to readily determine eligibility.  Assessors must always be vigilant as to for-profit entities using the façade of not-for-profit entities to gain the competitive advantage of reduced taxation.  Here, the entanglement of the for-profit and not-for-profit interests necessitates denial of the exemption.

**CONCLUSION.**

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED.